

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

**ENTERED**
**09/04/2012**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 03-44908** |
| **TRI-UNION DEVELOPMENT** | § | **CHAPTER  11** |
| **CORPORATION** | § | |
| | § | |
| Debtor(s). | § | **JUDGE ISGUR** |
| | § | |
| | § | |
| **PALM ENERGY GROUP, LLC,** *et al* | § | |
| | § | |
| Plaintiff(s), | § | |
| | § | |
| vs. | § | **ADVERSARY NO. 11-3032** |
| | § | |
| **GREENWICH INSURANCE COMPANY,** | § | |
| *et al* | § | |
| | § | |
| Defendant(s). | § | |

## <u>MEMORANDUM OPINION</u>

As part of the confirmation of Tri-Union Development Corporation's chapter 11 Plan, parties to this adversary proceeding entered into the Turnkey Agreement and Term Sheet.  The Turnkey Agreement and Term Sheet provided for the plugging and abandonment ("P&A") of Tri-Union's offshore oil and gas properties in accordance with federal regulations.  In the Term Sheet, Tri-Union, Palm Energy Partners, LLC ("PEP"), Greenwich Insurance Company, Apache Corporation, the United States Department of the Interior, Minerals Management Service (now the Bureau of Ocean Energy Management), and several other parties agreed in general terms that PEP would be paid to perform the P&A obligations.  Greenwich and Apache provided escrow funds for completion of the P&A obligations.

The Turnkey Agreement, entered into by Tri-Union, PEP, and Palm Energy Group ("PEG"), a wholly owned subsidiary of PEP, provides more specific terms for the completion of the P&A obligations.  The Turnkey Agreement gives the signatories to the Term Sheet the right to demand performance by PEG of its obligations under the Turnkey Agreement.

Under the confirmed chapter 11 Plan, PEP was appointed plan agent.  The Plan, Turnkey Agreement, Term Sheet, and escrow agreements established escrow accounts to pay for the performance of the P&A obligations.

The P&A obligations were to be performed in two phases.  The first phase was funded by the Phase 1 Escrow and has been completed.  The second phase was to be funded by the Phase 2 Escrow and the Apache Escrow.  The escrow agent for the Phase 2 Escrow is Greenwich, and the escrow agent for the Apache Escrow is Apache.

PEG, PEP, and Tri-Union now sue Greenwich and Apache for the alleged breach of their obligations under the Turnkey Agreement and Term Sheet.  The parties have asserted various counterclaims and cross-claims against each other.  Additionally, Greenwich sues the Bureau of Ocean Energy Management ("BOEM") as a third-party defendant.

This memorandum opinion concerns Greenwich's cross-claim against Apache.

Greenwich sues Apache, seeking declaratory judgment that (i) any monetary recovery to which Tri-Union, PEP, PEG, or unpaid vendors are entitled must first be paid from the Apache Escrow until the Apache Escrow is entirely exhausted before any amount may be paid from the Phase 2 Escrow, or, in the alternative; (ii) if Greenwich is required to forfeit its bonds to BOEM, Greenwich shall be subrogated to BOEM's rights against Apache to recover any amounts paid by Greenwich on the bonds.

Apache moves to dismiss the cross-claims or, in the alternative, for summary judgment. Apache asserts that under the Turnkey Agreement and Term Sheet, funds were not to be paid from the Apache Escrow until after the Phase 2 Escrow had been exhausted. Apache also asserts that Greenwich may not be subrogated to BOEM's rights, because a private party may not be subrogated to the government's police and regulatory powers.

The Court grants Apache's motions.

**Summary Judgment Evidence**

Apache provides the following summary judgment evidence:

- Exhibit 15:  Final Proposed Turnkey Proposal

- Exhibit 16:  Turnkey Service Agreement

- Exhibit 17:  Escrow Agreement, October 21, 2004, among PEG, Apache, and Deutsche Bank Trust Company

- Exhibit 18:  Escrow Agreement (Phase II), October 21, 2004

- Exhibit 19:  Mutual Release Agreement under Term Sheet, October 21, 2004

- Exhibit 20:  Correspondence, June 3, 2011 from BOEM to Greenwich

- Exhibit 21:  Escrow Agreement (Phase 1), October 21, 2004

- Exhibit 22:  Fourth Amended Chapter 11 Plan

- Exhibit 23:  Order Confirming Fourth Amended Chapter 11 Plan

Greenwich provides the following summary judgment evidence:[1]

- Exhibit A:  Turnkey Service Agreement

- Exhibit B:  Term Sheet

- Exhibit C:  Notice of Appearance and Request for Notice

- Exhibit D:  United States' Answer to Third-Party Complaint and Counterclaim against Greenwich Insurance Company

- Exhibit E:  Letter from BOEM to Tri-Union and PEP, December 13, 2005

- Exhibit F:  Letter from Tri-Union and PEP to BOEM, June 26, 2006

- Exhibit G:  Letter from BOEM to Tri-Union and PEP, August 23, 2006

- Exhibit H:  Letter to Greenwich from BOEM, April 29, 2011

- Exhibit I:  Letter to Greenwich from BOEM, May 20, 2011

- Exhibit J:  Letter to Greenwich from BOEM, June 3, 2011

- Exhibit K:  Letter from Tri-Union and PEP to BOEM, June 11, 2009

- Exhibit L:  Greenwich's First Set of Interrogatories and Requests for Production to Apache

- Exhibit M:  Apache's Objections and Responses to Greenwich's First Set of Interrogatories and Requests for Production to Apache

- Exhibit N:  Privilege Log Produced by Apache in Response to Greenwich's First Set of Interrogatories and Requests for Production to Apache

---

[1] Several of Greenwich's exhibits relate to its response to BOEM's motion to dismiss/motion for summary judgment against Greenwich, not Apache's motion.  The June 6, 2012 hearing related to both BOEM's motion and Apache's motion.

- Exhibit O: Composite Exhibit: Selected documents from Apache's document corporation. Documents 1-5 and 11 were admitted as part of the summary judgment record. Documents 6-10 were admitted for the limited purposes of showing that Greenwich and Apache both participated in the drafting of the agreements. Exhibit P: Greenwich's First Set of Interrogatories and Requests for Production to BOEM

- Exhibit Q: Composite Exhibit: Selected documents from BOEM's document production

## Background

Tri-Union is an oil and gas exploration, development and production company with oil and natural gas reserves in the Gulf of Mexico. Pursuant to federal regulations, Tri-Union was obligated to plug and abandon certain offshore wells and to perform various other decommissioning activities ("P&A obligations") that were intended to alleviate safety and environmental risks. Apache's Ex. 20; Apache's Ex. 16, at 10; Greenwich's Ex. A, at 10; Greenwich's Ex. H; *see* 30 C.F.R. § 250.101 *et seq.*; § 250.1700 *et seq.* (Subpart Q). Tri-Union owed the P&A obligations to the Minerals Management Service (now BOEM). Apache's Ex. 16, at 10; Greenwich's Ex. A, at 10.

Greenwich issued surety bonds in favor of MMS (BOEM) for the benefit of Tri-Union to ensure the satisfaction of the P&A obligations. Greenwich's Ex. H. Greenwich issued the following bonds:

| Bond Number | Amount | OCS Lease/ROW Number | Area/Block |
|:---:|:---:|:---:|:---:|
| 45035257 | $2,500,000 | OCS-G 01249 | ST 162 |
| 45035256 | $1,100,000 | OCS-G 01249 | ST 162 |
| 45035259 | $300,000 | OCS-G 11181[2] | HI A 537 |

---

[2] Greenwich denies that #4503529 covers the ROW. The Court need not decide this issue.

Greenwich's Exs. H, I & J.

Tri-Union Development Corporation filed for bankruptcy in 2003. Case No. 09-44908. Tri-Union's chapter 11 Plan was confirmed on September 30, 2004. No. 03-44909, ECF No. 6. The Plan provided for procedures to address Tri-Union's P&A obligations. PEP was the plan agent for Tri-Union and the 100% owner of PEG.

The Plan incorporated and approved settlement agreements with numerous parties related to the P&A obligations, including PEP; Greenwich; Apache; and the Minerals Management Service (predecessor to BOEM). No. 03-44909, ECF No. 6. The Court found that the compromises among the parties were integral to the transactions in the Plan and essential to satisfy claims that were central to the reorganization process. No. 03-44909, ECF No. 6.

Tri-Union, PEP, Greenwich, Apache, and several other parties entered into the Term Sheet, which laid out general terms for the completion of the P&A obligations. PEP was to complete the P&A obligations, and other parties were to provide and administer escrow funds. Apache's Ex. 15; Greenwich's Ex. B. The P&A obligations were to be completed in two phases: Phase 1 and Phase 2. Apache's Ex. 16, at 10; Greenwich's Ex. A, at 10-12. The following properties were to be plugged, abandoned, and otherwise decommissioned during Phase 1:

- Galveston 211
- High Island 261/262
- High Island A126/127
- High Island A129
- High Island A236/A224

Apache's Ex. 15; Greenwich's Ex. B.

Phase 2 would include the following properties:

- South Timbalier 162

- High Island A537/556

Apache's Ex. 15; Greenwich's Ex. B.

The properties to be plugged and abandoned as part of Phase 2 were the properties on which Greenwich issued the bonds. The Term Sheet required Greenwich to maintain the bonds in full force and effect. Apache's Ex. 15; Greenwich's Ex. B.

Under the Term Sheet, PEP was obligated to enter into "a mutually agreed to all inclusive defined fee Turnkey Contract for the complete offshore well plugging and abandonment platform, facility, and pipeline removal, site clearance, and relating decommissioning." Apache's Ex. 15, at 1; Greenwich's Ex. B, at 1. The Term sheet provided that "Palm shall be an independent contractor, and have sole responsibility for the performance and implementation of the Turnkey Contract satisfying the P&A Obligations under this Agreement." Apache's Ex. 15, at 9; Greenwich's Ex. B, at 9.

The Turnkey Agreement, entered into by PEP, PEG, and Tri-Union, with the signatories to the Term Sheet as third-party beneficiaries, laid out more specific terms for the completion of the P&A obligations. Apache's Ex. 16; Greenwich's Ex. A. Under the Turnkey Agreement, PEG was responsible for performing the P&A obligations. Apache's Ex. 16, at 10; Greenwich's Ex. A, at 10. The signatories to the Term Sheet were given the right to demand PEG's performance under the Turnkey Agreement. Apache's Ex. 16, at 8; Greenwich's Ex. A, at 8.

PEP and PEG would be paid from the Phase 1 Escrow to complete the Phase 1 obligations. Apache's Ex. 16, at 10; Greenwich's Ex. A, at 12.

Phase 2 of the P&A obligations was to be paid for from two escrow funds: the Phase 2 Escrow and the Apache Escrow. The Term Sheet states:

Payment to Palm for Phase 2 work (totaling Six Million Six Hundred Thousand Dollars ($6,600,000)) will be made as required from the Phase 2 Escrow and the Apache Escrow, as the case may be, in accordance with the terms of the Turnkey Contract and the respective Phase 2 Escrow and the Apache Escrow to be negotiated upon compliance with MMS regulations and certification requirements attributable to each of the Phase 2 properties' Obligations. Palm may also utilize the Phase 2 Escrow to secure and pay for work commitments to vendors with the consent of Greenwich. Palm may also utilize the Apache Escrow to secure and pay for work commitments to vendors with the consent of Apache after consultation with Greenwich.

Apache's Ex. 15, at 6; Greenwich's Ex. B, at 6.

The Term Sheet further provides:

Any Phase 2 Funding (except for the Apache Escrow) the Farmout consideration assigned to the Phase 2 Escrow, and any Net Offshore Production Proceeds shall be held as collateral to secure the outstanding Greenwich Bonds. Any Phase 2 Funding including the Apache Escrow, the Farmout consideration assigned to the Phase 2 Escrow, and any Net Offshore Productions Proceeds shall secure any obligations Apache may have to the MMS associated with ST 162 and/or HI 556/537 subject to and subordinated only to Greenwich's security interests.

Apache's Ex. 15, at 7; Greenwich's Ex. B, at 7.

The Turnkey Agreement states:

Palm shall be entitled to a total of Six Million Six Hundred Thousand Dollars ($6,600,000) for the P&A Activities associated with the Phase 2 Properties, to be paid when P&A is performed for each property set forth in Exhibit A-2 and in the installments set forth in Exhibit A-2. Palm may also utilize the Apache Escrow to secure and pay for work commitments to vendors with the consent of Apache after consultation with Greenwich. Palm may use the Phase 2 Escrow to secure and pay for work commitments with the consent of Greenwich.

Apache's Ex. 16, at 12; Greenwich's Ex. A, at 12.

In Section E of the Term Sheet, Greenwich agrees to release Apache from claims, subject to the Apache Escrow being paid out:

> Conditioned upon the execution of the Agreement and funding of amounts required at closing on the Effective Date of the Plan and execution of documentation for future funding as set forth herein by each party as specified, Greenwich shall release the Noteholders, BOA, Apache (subject to the Apache Escrow being fully paid out) and its predecessors in interest, Forest, NMLC and LL&E from any claim of any kind.  MMS agrees to demand forfeiture of the Greenwich bonds (which include for Phase 2 Properties both the remaining area wide and ST 162 lease specific) and MMS lease specific escrows before pursuing any potential claim for P&A from Apache and its predecessors in interest, Forest, NMLC and LL&E under the applicable MMS regulations. Greenwich reserves to the full extent, if any, all rights, claims and contentions for subrogation as a result of any payment under its bonds, with any party subject to such claims retaining all defenses and contentions there is no such claim[.]

Apache's Ex. 15, at 7; Greenwich's Ex. B, at 7.  The signatories to the Term Sheet also executed a Mutual Release Agreement Under Term Sheet.  Apache's Ex. 19.  The Mutual Release Agreement releases Apache and the other signatories "from and against any and all claims, demands, causes of action, or liabilities, of any and every character, kind and nature whatsoever."  Apache's Ex. 19, at 5.  The release is "[p]ursuant to Sections 'E' and 'O' or the Term Sheet."  Apache's Ex. 19, at 4.

Greenwich was appointed as the escrow agent for the Phase 1 Escrow and the Phase 2 Escrow.  Apache's Ex. 18; ECF No. 1, at 5; ECF No. 32, at 4; ECF No. 53, at 8.  The Escrow Agreement establishing the Phase 2 Escrow was signed by PEG, PEP, and Greenwich.

Deutsche Bank Trust Company Americas was appointed escrow agent of the Apache Escrow.  Apache's Ex. 17, at 1.  The Escrow Agreement establishing the Apache Escrow was signed by PEG, Apache, and Deutsche Bank.  Apache's Ex. 17, at 1, 12, 13 & 14.

The Escrow Agreement provides that Deutsche Bank shall hold the escrow funds until one of the following events occurs:  (i) Deutsche Bank receives joint written notice from Palm and Apache instrument Deutsche Bank to disburse the funds; (ii) Deutsche Bank receives a written notice from Palm signed by Palm's representative advising that all P&A obligations have been completed in accordance with MMS (BOEM) regulations, in which event Deutsche Bank shall disburse $650,000 to Palm and the remainder, if any, to Apache; (iii) Deutsche Bank receives a written notice from Apache indicating that the P&A obligations have not been performed on or before October 1, 2008; that Palm has wholly defaulted or abandoned its obligations under the Turnkey Agreement; or that MMS (BOEM) has demanded that Apache or other third parties perform some or all P&A obligations.  Apache's Ex. 17, at 3.

Under the Term Sheet, Tri-Union; Apache; Greenwich; and several other parties executed a Mutual Release Agreement.  Apache's Ex. 19.

The Phase 1 P&A obligations were completed.  ECF No. 1, at 5; ECF No. 32, at 4; ECF No. 53, at 8.

On October 18, 2007, PEG, acting as plan agent for Tri-Union, filed a motion to close the chapter 11 case.  ECF No. 1505.  The Court closed the case on November 21, 2007, ECF No. 1511.

On November 1, 2010, PEG and Tri-Union filed a motion to reopen the bankruptcy case, asserting that Greenwich had repeatedly refused to transfer funds into Tri-Union's operating account to allow the Phase 2 P&A obligations to be completed.  ECF No. 1521, at 4.  PEG and Tri-Union sought to reopen the case and to have the Court enter an order enjoining Greenwich and Apache from taking any steps to liquidate or transfer funds from the Phase 2 Escrow or the

Apache Escrow.  ECF No. 1521, at 7.  The Court reopened the case on December 7, 2010.  ECF No. 1532.

PEG and Tri-Union filed this adversary proceeding on January 25, 2011, suing Greenwich, Apache, and Nippon Oil Exploration U.S.A. Limited.[3]  PEG and Tri-Union assert claims for detrimental reliance and breach of contract against Greenwich and seek money judgment.  ECF No. 1, at 9-12.  PEG and Tri-Union sue Apache for breach of contract, seeking money judgment and injunctive relief requiring Apache to undertaking all remaining decommissioning activities associated with the South Timbalier Block 162 and High Island blocks A-537/556.  ECF No. 1, at 12-14.  PEG and Tri-Union also seek injunctive relief against Greenwich and Apache, requesting that they be enjoined from taking any steps to liquidate or transfer funds in the Phase 2 Escrow or Apache Escrow until the Court determines whether unpaid vendors should be reimbursed for their contribution to the decommissioning obligations.  ECF No. 1, at 14-15.  Finally, Tri-Union and PEG seek a declaratory judgment terminating all further responsibilities and liabilities with the remaining decommissioning activities on the Phase 2 properties.

Greenwich filed an answer on June 28, 2011.  ECF No. 32.  Greenwich asserts counterclaims against Tri-Union, PEG, and PEP, cross-claims against Apache, and a third-party complaint against BOEM, along with the United States Department of the Interior; Michael Bromwich, the Director of BOEM; and Kenneth Lee Salazar, the Secretary of the Interior (collectively, "other Third-Party Defendants").  ECF No. 32, at 30.

---

[3] Nippon was dismissed as a party on November 4, 2011.  ECF No. 99.

Apache filed an answer and affirmative defenses to Greenwich's cross-claim on July 29, 2011.  ECF No. 60.  Apache also filed a motion to dismiss Greenwich's cross claim, or, in the alternative, a motion for summary judgment, on July 29, 2011.  ECF No. 61.

Greenwich filed a response to Apache's motion on September 19, 2011.  ECF No. 90. Apache filed a reply on October 13, 2011.  ECF No. 91.

The Court held a hearing on the motion on May 10, 2012.  The  hearing  was  continued on June 6, 2012.  ECF No. 152.  Apache filed a supplemental brief on June 20, 2012.  ECF No. 153.

### Rule 12(b)(6) Standard

The Court reviews motions under Rule 12(b)(6) "accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiffs." *Stokes v. Gann*, 498 F.3d 483, 484 (5th Cir. 2007) (per curiam).  However, the Court "will not strain to find inferences favorable to the plaintiff." *Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353, 361 (5th Cir. 2004) (internal quotations omitted).

To avoid dismissal for failure to state a claim, a plaintiff must meet Fed. R. Civ. P. 8(a)(2)'s pleading requirements.  Rule 8(a)(2) requires a plaintiff to plead "a short and plain statement of the claim showing that the pleader is entitled to relief."  In *Ashcroft v. Iqbal,* the Supreme Court held that Rule 8(a)(2) requires that "the well-pleaded facts" must "permit the court to infer more than the mere possibility of misconduct."  556 U.S. 662, 679 (2009) (quoting Rule 8(a)(2)).  "Only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).  "[A] complaint does not need detailed factual allegations, but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true raise a right to

relief above the speculative level." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009) (internal quotation marks removed).

A motion under Rule 12(b)(6) will be treated as one for summary judgment under Rule 56 when matters outside the pleadings are presented and not excluded by the Court.  Fed. R. Civ. P. 12(d); Fed. R. Bankr. P. 7012(b).  Under Rule 56, summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); Fed. R. Bankr. P. 7056.  In the event a motion to dismiss is converted to one for summary judgment, a court must first give the parties notice and then may consider all evidence presented.  *Rodriguez v. Rutter*, 310 F. App'x 623, 626 (5th Cir. 2009).

### Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Fed. R. Bankr. P. 7056 incorporates Rule 56 in adversary proceedings.

A party seeking summary judgment must demonstrate:  (i) an absence of evidence to support the non-moving party's claims or (ii) an absence of a genuine dispute of material fact. *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009); *Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006).  A genuine dispute of material fact is one that could affect the outcome of the action or allow a reasonable fact finder to find in favor of the non-moving party. *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008).

A court views the facts and evidence in the light most favorable to the non-moving party at all times.  *Campo v. Allstate Ins. Co.*, 562 F.3d 751, 754 (5th Cir. 2009).  Nevertheless, the Court is not obligated to search the record for the non-moving party's evidence.  *Malacara v.*

*Garber*, 353 F.3d 393, 405 (5th Cir. 2003).   A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record, showing that the materials cited do not establish the absence or presence of a genuine dispute, or showing that an adverse party cannot produce admissible evidence to support the fact.[4]   Fed. R. Civ. P. 56(c)(1).   The Court need consider only the cited materials, but it may consider other materials in the record.   Fed. R. Civ. P. 56(c)(3).   The Court should not weigh the evidence.   A credibility determination may not be part of the summary judgment analysis. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).   However, a party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.   Fed. R. Civ. P. 56(c)(2).

"The moving party bears the burden of establishing that there are no genuine issues of material fact." *Norwegian Bulk Transp. A/S v. Int'l Marine Terminals P'ship*, 520 F.3d 409, 412 (5th Cir. 2008).   The evidentiary support needed to meet the initial summary judgment burden depends on whether the movant bears the ultimate burden of proof at trial.

If the movant bears the burden of proof on an issue, a successful motion must present evidence that would entitle the movant to judgment at trial. *Malacara*, 353 F.3d at 403.   Upon an adequate showing, the burden shifts to the non-moving party to establish a genuine dispute of material fact. *Sossamon*, 560 F.3d at 326.   The non-moving party must cite to specific evidence demonstrating a genuine dispute.   Fed. R. Civ. P. 56(c)(1); *Celotex Corp. v. Cattrett*, 477 U.S. 317, 324 (1986).   The non-moving party must also "articulate the manner in which that evidence supports that party's claim." *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*,

---

[4] If a party fails to support an assertion or to address another party's assertion as required by Rule 56(c), the Court may (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if, taking the undisputed facts into account, the movant is entitled to it; or (4) issue any other appropriate order.  Fed. R. Civ. P. 56(e).

379 F.3d 293, 301 (5th Cir. 2004).  Even if the movant meets the initial burden, the motion should be granted only if the non-movant cannot show a genuine dispute of material fact.

If the non-movant bears the burden of proof of an issue, the movant must show the absence of sufficient evidence to support an essential element of the non-movant's claim. *Norwegian Bulk Transp. A/S*, 520 F.3d at 412.  Upon an adequate showing of insufficient evidence, the non-movant must respond with sufficient evidence to support the challenged element of its case.  *Celotex*, 477 U.S. at 324.  The motion should be granted only if the non-movant cannot produce evidence to support an essential element of its claim.  *Condrey v. Suntrust Bank of Ga.*, 431 F.3d 191, 197 (5th Cir. 2005).

## Analysis

Greenwich asserts two cross-claims against Apache:  (i) declaratory judgment that any monetary recovery in this proceeding must be paid from the Apache Escrow before any disbursement from the Phase II Escrow; and (ii) declaratory judgment that Greenwich is subrogated to BOEM's rights against Apache to recover any amounts paid by Greenwich on the bonds.

Apache moves for summary judgment, arguing that there is no genuine dispute as to either of these cross-claims.  Apache argues that the claims are not ripe.  Apache also argues that Greenwich may not be subrogated to BOEM's rights because a nongovernmental party may not be subrogated to an agency's police and regulatory powers.  Finally, Apache argues that even if Greenwich is subrogated to BOEM's rights, BOEM would not have had the right to pursue a claim against Apache until after Greenwich's bonds were exhausted.

***Ripeness of the Claims***

The Court first addresses the ripeness of the claims. Both claims for declaratory judgment are arguably contingent. The first claim is contingent upon Tri-Union, PEP, PEG, and the Unpaid Vendors being awarded monetary recovery in this adversary proceeding. The second claim is contingent on BOEM's prevailing against Greenwich on its claim for forfeiture of the bonds.

Under Rule 14, a party may implead contingent claim against a third-party defendant. *St. Paul Fire & Marine Ins. Co. v. United States Lines Co.*, 258 F.2d 374, 375-76 (2d Cir. 1958) (allowing insurance company to assert a subrogation claim against a third-party defendant prior to a judgment on the claim against the insurance company); *see Traveler's Ins. Co. v. Busy Elec. Co.*, 294 F.2d 139, 145 (5th Cir. 1961) ("Relief need not be thwarted by the nature of indemnity which ordinarily imposes an obligation to reimburse another only after sustaining a loss. This may be handled either by a conditional decree or the entry of a declaratory judgment.") (citations omitted). A court may grant relief only in accordance with the parties' relative substantive rights. *Traveler's Ins.*, 294 F.2d at 146.

Rule 14 states that a "defending party may, as third-party plaintiff, serve a summons and complaint on a nonparty who is or may be liable to it for all or part of the claim against it." Fed. R. Civ. P. 14(a)(1). Rule 14 is applicable to any "nonparty" to a particular claim. *See In re Oil Spill by Amoco Cadiz Off Coast of France on March 17, 1978*, 491 F. Supp. 161, 166 (N.D. Ill. 1979) ("With respect to each individual claim filed in the limitation action, the only 'parties' to the claim are Amoco Transport as limitation plaintiff and the individual claimant. No claimant is a 'party' to the others' claims. Therefore, France and/or the other named third-party plaintiffs can be impleaded with respect to claims other than their own.").

Apache and Greenwich are defendants to the same claims by Tri-Union, PEP, and PEG. Greenwich's first claim against Apache therefore is not properly an impleader, but a cross-claim—as it is labeled in Greenwich's answer.  ECF No. 32, at 27.  However, a party may assert a cross-claim that is contingent on the outcome of the underlying claim.  *See* Fed. R. Civ. P. 13(g) ("The crossclaim may include a claim that the coparty is or may be liable to the crossclaimant for all or part of a claim asserted in the action against the crossclaimant."); *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 90 (2d Cir. 2002) ("It is understood that CU's right to collect on its cross-claim is contingent on it being found liable and indemnifying Multifoods. . . . As a matter of efficiency and judicial economy, it made sense for CU to raise this issue within these proceedings.").

Apache is not already a party to BOEM's claim against Greenwich for forfeiture of the bonds.  ECF No. 74, at 21-25.  BOEM did not assert a claim against Greenwich in this proceeding until after Greenwich had already asserted its claim for declaratory judgment as to subrogation rights against Apache.  At the time Greenwich asserted its contingent subrogation claim, Rule 14 would not have applied.  Nevertheless, the Court assumes for summary judgment purposes that BOEM's assertion of the forfeiture claim against Greenwich allows Greenwich to implead Apache.

The Court thus looks to the substance of the underlying claims.

### Greenwich's Claims Against Apache

There is no genuine dispute of material fact as to (i) whether there is any basis for requiring Tri-Union, PEP, and PEG to collect Apache's funds first; or (ii) whether Greenwich would actually have any subrogation rights against Apache upon forfeiture of the bonds.

Because there is no genuine dispute as to these facts, Greenwich cannot prevail on its claims against Apache.

### 1.   Claim for Declaratory Judgment that Recovery Must First Be Paid from Apache Escrow

Greenwich's complaint does not provide any legal or factual basis for its claim for declaratory judgment that any monetary recovery in this adversary proceeding must first be paid from the Apache Escrow.  Greenwich does, in its second request for declaratory relief, cite "Apache's position as predecessor-in-interest on the Phase 2 Properties."  ECF No. 32, at 29. Greenwich also incorporates the pleadings from paragraphs 102 through 121 of its answer.  ECF No. 32, at 28.  Paragraph 102 incorporates allegations from the amended complaint that Greenwich admits in its answer.  ECF No. 32, at 28.  The admitted facts that pertain to the Apache Escrow are:

> [¶ 14 of Amended Complaint:]     PEG was to be paid for its work associated with the Phase 2 P&A Obligations out of the "Phase 2 Escrow."   In addition, a separate escrow was also established for the Phase 2 Properties, namely, HI 556-537 and ST 162, using funds deposited by Apache (the "Apache Escrow").

> [¶ 14 of Answer:]     Greenwich states that the Turnkey Agreement, Term Sheet and escrow agreements speak for themselves and denies the remaining allegations in Paragraph 14 of the Amended Complaint to the extent the Plaintiffs' description of the Phase 2 Escrow and Apache Escrow are inconsistent with the Turnkey Agreement, Term Sheet, and escrow agreements.  By way of further answer, the Turnkey Agreement required PEG and PEP to perform work even if they were not paid because of the nature of the Turnkey Agreement.

> [¶ 16 of Amended Complaint:]     Greenwich was appointed as the escrow agent for both the Phase 1 Escrow and the Phase 2 Escrow, but not the Apache Escrow.

> [¶ 16 of Answer:]     Greenwich admits the allegations in Paragraph 16 of the Amended Complaint.

[¶ 40 of Amended Complaint:]      Apache is the direct predecessor-in-interest to Tri-Union for the Phase 2 Properties, which includes Tri-Union's remaining interest in South Timbalier Block 162 and High Island Blocks A537/556.

[¶ 40 of Answer:]      Greenwich admits the allegations in Paragraph 40 of the Amended Complaint.

[¶ 41 of Amended Complaint:]      Pursuant to the Bankruptcy Plan, the Term Sheet, and the other Plan Documentation, Apache established the Apache Escrow to ensure that Tri-Union, PEG, and/or PEP would be able to complete the Phase 2 P&A Obligations.

[¶ 41 of Answer:]      With respect to the allegations in Paragraph 41 of the Amended Complaint, Greenwich admits solely that the Apache Escrow was established; Greenwich denies the remaining allegations in Paragraph 41 of the Amended Complaint.

[¶ 42 of Amended Complaint:]      The Apache Escrow subordinates Apache's security interests in all pledged funds to "the rights of [PEG] to receive payments therefrom in accordance with the terms and conditions of the Turnkey Agreement and the Escrow Agreement."

[¶ 42 of Answer:]      With respect to the allegations in Paragraph 42 of the Amended Complaint, Greenwich states that the Apache Escrow speaks for itself; Greenwich denies the remaining allegations in Paragraph 42 of the Amended Complaint.

[¶ 43 of Amended Complaint:]      To date, no funds have been made available from the Apache Escrow to pay for any of the Phase 2 Obligations undertaken by Plaintiffs, even though none of the Plaintiffs have received the contractually mandated $6.6 million to pay for the Phase 2 P&A Obligations, all of which constitutes breach of the Term Sheet and related Plan Documentation by Apache.

[¶ 43 of Answer:]      Greenwich admits that the funds from the Apache Escrow have not been made available to the Plaintiffs to pay for the Phase 2 P&A Obligations; Greenwich denies the remaining allegations in Paragraph 43 of the Amended Complaint.

[¶ 44 of Amended Complaint:]      The Apache Escrow is part of the $6.6 million to be paid to Plaintiffs for the Phase 2 P&A Obligations.   Failure to liquidate same to pay Plaintiffs, for ultimate payment to the Unpaid Vendors, is a breach of the Term Sheet and other Plan Documentation.   Consequently, Plaintiffs are entitled to a judgment against Apache directing it to pay Tri-Union any amounts not paid by Greenwich, whether from the Phase 2 Escrow or otherwise, so that Tri-Union can pay PEG amounts due and owing under the Turnkey  Agreement, so that PEG can then pay the Unpaid Vendors, and to compensate Tri-Union and PEG for all additional damages associated with such contractual breaches associated with the Apache Escrow.   Plaintiffs also request judgment for all costs and attorneys fees associated with this breach of contract.

[¶ 44 of Answer:]      Greenwich denies that the Apache Escrow is to be paid to the Plaintiffs as described in Paragraph 44 of the Amended Complaint; Greenwich denies that the failure to liquidate the Apache Escrow to pay the Unpaid Vendors constitutes a breach of the Term Sheet and the other Plan Documentation; Greenwich denies the remaining allegations in Paragraph 44 and denies the Plaintiffs' entitlement to the relief sought in Paragraph 44.

ECF No. 29, at 5, 12 ; ECF No. 32, at 3-4, 6-7,

Greenwich admits that the Apache Escrow exists, that Apache is the direct predecessor-in-interest of Tri-Union, and that no Apache Escrow funds have been made available to pay Phase 2 expenses.   Greenwich denies that the funds are to be paid from the Apache Escrow in the manner alleged in the Amended Complaint, but does not assert facts as to how it is to be paid. The admissions do not provide any support for Greenwich's assertion that funds should be paid first from the Apache Escrow.

Similarly, paragraphs 102 through 121 of the Answer, Greenwich's own allegations, do not contain any facts to support Greenwich's assertion that recovery must first be paid from the Apache Escrow.   With respect to the Apache Escrow, Greenwich makes the following allegations:

[¶ 105:]    A separate escrow was established for HI 556-537 and ST162 (part of the Phase 2 Properties) using funds paid by Apache.  This escrow was known as the "Apache Escrow."  The Phase 1 Escrow, the Phase 2 Escrow and the Apache Escrow are known as the "Escrow Accounts."

[¶ 108:]    Besides serving as administrator [of the Escrow Accounts], Greenwich would also keep the then outstanding Bonds associated with the Properties in place in favor of BOEMRE without requiring additional cash collateral or other security other than the amounts required to be paid into the Escrow Accounts—amounts upon which Greenwich had (and has) a first lien to secure the remaining Bonds.  Under the Term Sheet, Greenwich reserved the "right to seek to restructure its existing bonds in accordance with [BOEMRE] regulations in its sole discretion, utilizing the escrowed funds."  This includes using escrowed funds to obtain the Bonds' release by setting up lease-specific escrows from the $1.7 million of Bonds in Phase 1, which lease-specific escrows were to be released by BOEMRE upon BOEMRE's certification that the P&A Obligations for such leases had been completed.  **The Escrow Accounts (other than the Apache Escrow) would then continue to secure the Bonds after confirmation of the Bankruptcy Plan and the execution of the Term Sheet by the parties.**

ECF No. 32, at 15, 16-17 (emphasis added).  These allegations provide no factual or legal basis to allow the Court to infer that funds should be paid from the Apache Escrow before being paid from the Phase 2 Escrow.  The only specific allegation about the relationship between the Apache Escrow and the Phase 2 Escrow is Greenwich's allegation that the Apache Escrow, unlike the Phase 1 Escrow and the Phase 2 Escrow, would not secure the bonds after confirmation of the Plan.

This is an insufficiently pleaded basis for the requested declaratory relief.  A plaintiff is required to plead more than a bare request for relief; the plaintiff must also provide plausible grounds for its entitlement to that relief.  *Iqbal*, 556 U.S. at 679.  Accordingly, Greenwich has failed to state a claim with respect to first request for declaratory relief.

21 / 25

Apache argues that Greenwich has waived any claim against Apache other than subrogation. Apache's Ex. 19, at 4-5; Apache's Ex. 15, at 7. Greenwich argues that its release of Apache was, as the Term Sheet states, "subject to the Apache Escrow being fully paid out." Greenwich's Ex. B, at 7. There is a genuine dispute as to whether Greenwich's waiver of claims against Apache is effective until the Apache Escrow is fully paid out. The Court therefore does not grant summary judgment on the basis of the waiver. Nevertheless, because Greenwich has failed to state a claim for this relief, the claim will be dismissed.

### 2. Claim for Declaratory Judgment on Subrogation Rights

If the other requirements for subrogation are met, Greenwich may be subrogated to BOEM's priority and claims, but it may not be subrogated to BOEM's police powers. *In re Tri-Union Dev. Corp.*, 314 B.R. 611, 622-23 (Bankr. S.D. Tex. 2004) ("[T]his Court finds that the Respondents are not subrogated to the police powers of the MMS, but rather that the Respondents are only subrogated to the priority and claims of the MMS.").

Apache argues that Greenwich may not be subrogated to BOEM's rights, citing the Court's earlier opinion in *Tri-Union*, 314 B.R. at 622. *Tri-Union* does not establish that subrogation rights are only available with respect to the debtor. *Id.* That opinion did not address the issue of whether a surety may be subrogated to parties other than the debtor; instead, the Court dealt with the issue of whether Greenwich could be subrogated to BOEM's police powers, or only its claim and priority. The Court held that under 31 U.S.C. § 9309, Greenwich was subrogated only to the claim and priority of BOEM. *Id.*

Apache argues that 31 U.S.C. § 9309 does not allow Greenwich to be subrogated against any party but the debtor. The statute codifies the priority of sureties when a principal obligor is insolvent or dies having assets insufficient to pay debts. However, a surety's potential right to

subrogation is not dependent on the statute.  *See Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 136-37 (1962) ("Traditionally sureties compelled to pay debts for their principal have been deemed entitled to reimbursement, even without a contractual promise such as the surety here had.  And probably there are few doctrines better established than that a surety who pays the debt of another is entitled to all the rights of the person he paid to enforce his right to be reimbursed.").  Section 9309 does not implicitly exclude a surety from subrogation against third parties; it simply does not mention it.

If the underlying agreements require Greenwich to pay before Apache pays, Greenwich has no subrogation rights against Apache.

Apache's liability with respect to the P&A obligations is based on 30 C.F.R. § 250.1701. Under § 250.1701, "Lessees and owners of operating rights are jointly and severally responsible for meeting decommissioning obligations for facilities on leases, including the obligations related to lease-term pipelines, as the obligations accrue and until each obligation is met." Therefore, with respect to BOEM, Apache is jointly and severally liable with Tri-Union for any P&A obligations that accrued while Apache owned the properties that were later acquired by Tri-Union.

Subrogation has long been considered an equitable right, governed by principles of equity.  *Prairie State Nat. Bank v. U.S.,* 164 U.S. 227, 17 S.Ct. 142 (1896).

Both Greenwich and Apache have potential liability to the MMS.  Although Apache is not technically a surety to either Tri-Union or the MMS (its obligations arise because it was a prior title holder in the chain of title), the equitable concepts concerning subrogation rights against mutual secondary obligors are well defined under suretyship law.  The Court will rely on

the equitable principles of suretyship law to determine the subrogation rights of two liable parties, each of whom have the right to look to Tri-Union as the primary obligor.

There is no dispute between the parties that the terms of Tri-Union's acquisition from Apache required Tri-Union to reimburse Apache for any P&A expenses. Apache is a predecessor in interest to Tri-Union. *In re Tri-Union Development Corp.*, 314 B.R. 611, n.4 (Bankr. S.D. Tex. 2004). Apache filed a proof of claim against Tri-Union. The proof of claim demonstrates that—as between Tri-Union and Apache—Tri-Union had the primary duty to perform the P& Obligations. *See* Exhibit 1 to Proof of Claim No. 251 filed in case 03-44908. The issue is not one in genuine dispute. Fed. R. Bankr. P. 7056. Accordingly, Greenwich (as the issuer of surety bonds) and Apache (as the predecessor-in-interest) are both secondary obligors to Tri-Union.

Greenwich assured only Tri-Union's obligation, not Apache's. If Greenwich pays Tri-Union's obligation to BOEM, then Greenwich may be subrogated to BOEM's rights with respect to Tri-Union's obligation. Restatement (3d) of Suretyship and Guaranty § 27.

The suretyship rights of secondary obligors are well established by the Restatement (3d) of Suretyship and Guaranty. The Court relies primarily on §§ 55-59 of the Restatement. Section 59 provides that—as between two sureties—a senior surety will have no claims against a secondary surety. Restatement (3d) of Suretyship and Guaranty. In the present case, Greenwich accepted the duty to pay Tri-Union's obligations to the MMS. If Greenwich pays MMS, its priority as to Apache does not change by payment. Rather, equitable principles dictate that Greenwich—having paid as a surety for Tri-Union—is governed by equitable principles to bear the primary loss. It has no subrogation claim against Apache unless it pays an amount greater than its bond.

Greenwich does not assert that it has or will pay an amount greater than its bond. Although Greenwich will obtain subrogation rights from the MMS, the assertion of those subrogation rights against Apache is circumscribed by equitable principles. Accordingly, if Greenwich pays its bonded amount to the MMS, it will have no claim against Apache.

The Court recognizes the possibility that Greenwich, in funding P&A expenses, may pay more than the amount of its bond. The Court does not presently define the rights of the parties if such an event arises.

## Conclusion

By separate order, the Court will:

- Grant summary judgment in favor of Apache that Greenwich may not assert subrogation rights against Apache for payments up to the amount of its bond.

- Dismiss Greenwich's claim against Apache with respect to the escrowed funds.

SIGNED **September 3, 2012.**

Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE