

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

**ENTERED**
**09/29/2015**

| | | |
|---|---|---|
| **IN RE:** | § | |
| **TRI-UNION DEVELOPMENT** | § | **CASE NO: 03-44908** |
| **CORPORATION** | § | |
| Debtor(s) | § | |
| | § | **CHAPTER  11** |
| | § | |
| **PALM ENERGY GROUP, LLC,** *et al* | § | |
| Plaintiff(s) | § | |
| | § | |
| **VS.** | § | **ADVERSARY NO. 11-3032** |
| | § | |
| **GREENWICH INSURANCE COMPANY,** *et* | § | |
| *al* | § | |
| Defendant(s) | § | |

## MEMORANDUM OPINION

The United States of America, on behalf of the Department of the Interior, Bureau of Ocean Energy Management, and Bureau of Safety and Environmental Enforcement, has filed a motion for summary judgment on its counterclaim against Greenwich Insurance Company. Greenwich has filed a cross-motion for summary judgment.  The United States' motion is granted.  Greenwich's cross-motion is denied.  The United States is entitled to judgment as a matter of law.  Greenwich must pay the $3,900,000.00 balance of the surety bonds.

Greenwich has also filed a motion for summary judgment on all claims of Tri-Union Development Corporation, Palm Energy Group, LLC, and Palm Energy Partners, LLC. Summary judgment is granted over Plaintiffs' claim for a permanent injunction.  Summary judgment is also granted as to whether Plaintiffs may recover based on the entire value of the contracts at issue.  The motion is denied with respect to all other claims.  The parties are invited to file briefs regarding the proper disposition of the Phase 2 Escrow by October 20, 2015, at 5:00 p.m.

**Background**

*The Tri-Union Bankruptcy*

Tri-Union was an oil and gas company that owned and operated an exploration and production business with several offshore properties located in both federal and Texas waters in the Gulf of Mexico. (ECF No. 154 at 4). Apache Corp. was a predecessor in interest to several of these offshore properties. *Id.* The properties relevant to this lawsuit are located on the Outer Continental Shelf ("OCS") and are subject to the regulatory authority of the Department of the Interior, pursuant to the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331, *et seq.* The Bureau of Ocean Energy Management ("BOEM") and Bureau of Safety and Environmental Enforcement ("BSEE") are charged with promoting energy independence, environmental protection, safety, resource conservation, and the economic development of the OCS. (ECF No. 191 at 3; ECF No. 191-1 at 2). BSEE was formerly known as the Bureau of Ocean Energy Management and Enforcement ("BOEMRE"), itself formerly known as the Minerals Management Service ("MMS").

As the owner or operator of offshore oil and gas wells in the OCS, Tri-Union had certain obligations to plug and abandon offshore wells, remove offshore platforms, pipelines, and facilities, conduct site clearance operations, and perform additional decommissioning activities (collectively the "P&A Obligations"). *In re Tri-Union Dev. Corp.*, 314 B.R. 611, 615 (Bankr. S.D. Tex. 2004). In order to enforce the P&A Obligations, MMS required the obligor to arrange for the issuance of surety bonds in favor of MMS. *Id.* Tri-Union obtained surety bonds from Greenwich with an effective date of July 1, 2001 to replace its previous bonds issued by Frontier Insurance Company. (ECF Nos. 116-1; 116-2). The three bonds at issue are as follows:

| Bond Number | Amount | OCS Lease/ROW Number | Area/Block |
|---|---|---|---|
| 45035257 | $2,500,000 | OCS-G 01249 | ST 162 |
| 45035256 | $1,100,000 | OSC-G 01249 | ST 162 |
| 45035259 | $300,000 | OSC-G 11181 | HI A 537 |

Bonds # 45035257 and 45035256 were issued on June 27, 2001 and stated: "The Surety does hereby absolutely and unconditionally bind itself to the United States of America acting through and by the Minerals Management Service (MMS), or other such official designated by the Secretary of Interior for this purpose, for the payment of all the cost of the plugging and abandonment Obligations." (ECF No. 116-1 at 4, 12).

Bond # 45035259, issued on July 2, 2001, was a Right-of-Way Grant Bond and extended to "any grant of right-of-way issued, maintained, or approved under the Outer Continental Shelf Lands Act . . . within the geographical area specified in Schedule A [the Gulf of Mexico]." (ECF No. 116-2 at 4). The bond also covered any "instrument hereinafter, issued, entered into, or acquired by, the principal authorizing pipeline operations in the [Gulf of Mexico]." *Id.*

On October 20, 2003, Tri-Union filed for chapter 11 bankruptcy. (Case No. 03-44908; ECF No. 1). Tri-Union's chapter 11 plan was confirmed on September 30, 2004. (Case No. 03-44908; ECF No. 1083). The Confirmation Order incorporated and approved a settlement agreement and term sheet (the "Term Sheet") between numerous parties affected by Tri-Union's P&A Obligations, including Tri-Union, Apache, Greenwich, MMS, and Palm Energy Partners (a Tri-Union affiliate). The Term Sheet laid out general terms for the completion of the P&A Obligations. Tri-Union's properties were to be decommissioned and permanently abandoned in

two separate phases, identified as Phase 1 and Phase 2.[1]  (ECF No. 193-3 at 33).  The properties at issue in this lawsuit for which Greenwich issued surety bonds were Phase 2 properties.  (ECF No. 154 at 7).

Under the Term Sheet, PEP and its subsidiary Palm Energy Group (collectively, "Palm") were "obligated to enter into a mutually agreed to all inclusive defined fee Turnkey Contract for the complete offshore well plugging and abandonment platform, facility, and pipeline removal, site clearance, and relating decommissioning . . . until all offshore P&A operations are completed and approved by the MMS. . . .[2]"  (ECF 193-3 at 33).  Tri-Union, PEG, and PEP entered into a Turnkey Agreement on October 21, 2004.  (ECF No. 1-2 at 8).  All other signatories of the Term Sheet were named third-party beneficiaries to the Turnkey Agreement.  *Id.*  In accordance with the Turnkey Agreement, PEG was to perform both phases of the required decommissioning.  (ECF No. 1-2 at 10).

The Term Sheet also set forth the source of the funds which would be used to conduct the decommissioning process.  The parties created two escrow accounts, the Phase 1 Escrow and the Phase 2 Escrow, to pay PEP and PEG for the P&A work.  (ECF No. 193-3 at 35).  Phase 1 Escrow totaled $7,775,000.00 while Phase 2 Escrow totaled $6,600,000.00, "to be paid in mutually agreeable segregable portions upon completion of the segregable portion of the P&A."  *Id.*  Greenwich served as the escrow agent for the Phase 1 and Phase 2 Escrows.  A separate escrow account was also established for the Phase 2 Properties using funds paid by Apache (the "Apache Escrow").  Payments for Phase 2 work would "be made as required from the Phase 2 Escrow and the Apache Escrow, as the case may be, in accordance with the terms of the Turnkey

---

[1] Phase 1 consisted of the following properties: (1) Galveston 211; (2) High Island 261/262; (3) High Island A126/127; (4) High Island A129; (5) High Island A237/A224.  Phase 2 consisted of: (6) South Timbalier 162 and (7) High Island A537/556.  (ECF No. 193-3 at 33).

[2] PEG was a special purpose entity created solely for the purpose of completing the P&A Obligations.

Contract and the respective Phase 2 Escrow and the Apache Escrow to be negotiated upon compliance MMS regulations and certification requirements attributable to each of the Phase 2 properties' Obligations." *Id.* at 38. In addition, PEG could "utilize the Phase 2 Escrow to secure and pay for work commitments to vendors with the consent of Greenwich." *Id.*

*The Decommissioning Process*

PEG completed the Phase 1 P&A Obligations in 2005. (ECF No. 193 at 7). On December 12, 2005, MMS sent Tri-Union a letter notifying it that the Phase 1 Properties were plugged and abandoned in accordance with MMS requirements. (ECF No. 193-5).

Despite some initial successes, Phase 2 decommissioning did not proceed as smoothly. Palm began decommissioning Phase 2 in 2005 after the completion of Phase 1. On December 13, 2005, MMS requested a timetable for the timely completion of platform removal for South Timbalier Block 162, which had been damaged by Hurricane Katrina. (ECF No. 31-4). Tri-Union and Palm were able to obtain an extension through June 30, 2006, to complete removal of ST 162. (ECF No. 31-5). Unable to meet to meet this deadline, Tri-Union and Palm requested an additional extension through March, 2007. *Id.* MMS approved this request on August 23, 2006.

On July 31, 2006, MMS issued an Incident of Noncompliance stating that Tri-Union and PEP had not properly abandoned its right of way for OCS-G 11181. Despite this Incident of Noncompliance, Tri-Union and PEP did not request approval to relinquish their right-of-way easement and remove the pipeline until June 11, 2009. (ECF No. 90-3). Tri-Union and Palm proposed that abandonment operations commence on July 15, 2009. MMS approved the application on August 13, 2009. (ECF No. 191-4).

As of April 6, 2010, ST 162 and HI A537 were still not properly decommissioned.  (ECF No. 191-1 at 6).  MMS granted another extension until May 4, 2010 to allow Palm and Apache to propose a plan for decommissioning.  *Id.*  Palm requested that Greenwich disburse the remaining $520,000.00 in the Phase 2 Escrow to allow work to continue, but Greenwich refused, arguing that funds "in excess of the allocated portions under the Turnkey, have been distributed to or on behalf of Palm Group" and further that the P&A Obligations were not completed to MMS's satisfaction.  (ECF No. 191-5 at 1-2; ECF No. 198-9).  As a result, Palm was unable to pay several of its contractors.  By March or April of 2010, Palm was no longer performing any decommissioning activities.

While the Phase 2 operations were proceeding fitfully, PEG, as the plan agent for Tri-Union, had previously filed a motion to close the chapter 11 case on October 18, 2007.  (Case No. 03-44908; ECF No. 1505).  The case was closed on November 21, 2007.  (Case No. 03-44908; ECF No. 1511).  On November 1, 2010, Tri-Union and PEG filed a motion to reopen the bankruptcy case, alleging that they were unable to complete the P&A Obligations due to Greenwich's repeated refusal to transfer funds to Tri-Union's operating account.  (Case No. 03-44908; ECF No. 1521 at 4).  The Court granted the motion on December, 7, 2010.

*Adversary Proceeding No. 11-3032*

On January 25, 2011, Tri-Union and PEG filed this adversary proceeding against Greenwich, Apache, and Nippon Oil Exploration U.S.A. Limited.[3]  (ECF No. 1).  Tri-Union and PEG asserted claims for detrimental reliance and breach of contract against Greenwich.  *Id.* at 9-12.  Plaintiffs sued Apache for breach of contract, seeking a money judgment and injunctive relief requiring Apache to undertake all remaining P&A Obligations associated with ST 162 and HI A537/556.  *Id.* at 12-14.

---

[3] Nippon was dismissed as a party on November 4, 2011.

Following the commencement of the adversary proceeding, on April 29, 2011, BOEMRE sent a letter to Greenwich, informing Greenwich that Tri-Union was in default due to its continued failure to remove the ST 162 debris.  (ECF No. 116-6).  BOEMRE stated that Tri-Union's default called for the forfeiture of Greenwich's two bonds on ST 162: #45035257 in the amount of $2,500,000.00 and #45035256 in the amount of $1,100,000.00.  *Id.*  On May 20, 2011, BOEMRE sent another letter to Greenwich stating that Tri-Union was in default on the ROW OCS-G 11181 for its failure to complete the right-of-way decommissioning.  (ECF No. 116-7).  BOEMRE called for the forfeiture of Greenwich's bond on the ROW: #45035259 in the amount of $300,000.00.  *Id.*

On June 27, 2011, Greenwich filed a Notice of Appeal regarding the forfeiture orders before the Interior Board of Land Appeals (IBLA).  (ECF No. 193-14).  The IBLA docketed the appeal on July 11, 2011.  (ECF No. 193-15).  The IBLA appeal is currently suspended pending this Court's resolution of the forfeiture orders.  (ECF No. 193-20).

Greenwich filed an answer to Tri-Union's complaint on June 28, 2011.  (ECF No. 32).  In it, Greenwich asserted counterclaims against Tri-Union, PEG, and PEP, cross-claims against Apache, and a third-party complaint against BOEM, the Department of the Interior, Interior Secretary Kenneth Lee Salazar, and BOEM Director Michael Bromwich.  *Id.* at 30.  The United States answered Greenwich on August 3, 2011, and asserted a compulsory counterclaim against Greenwich.  (ECF No. 74).

On October 13, 2011, Tri-Union, PEP, PEG, and Apache filed an emergency motion in the main bankruptcy case for an order in aid of consummation of the plan.  (Case No. 03-44908; ECF No. 1535).  Because Palm could no longer complete the P&A Obligations, Apache volunteered to finish Phase 2, subject to a reservation of its legal and contractual rights against

any party.  *Id.* at 11.  The Court granted the motion on October 27, 2011.  Apache obtained approval from BSEE and completed all Phase 2 P&A Obligations in 2012 and 2013.  (ECF No. 191-11).  Apache alleges that the total costs for the Phase 2 P&A Obligations exceeded $14 million.  (ECF No. 196 at 7).

On July 29, 2011, Apache filed a motion to dismiss Greenwich's cross-claim.  (ECF No. 61).  On February 8, 2012, BOEM filed a motion to dismiss Greenwich's third-party complaint or alternatively for summary judgment, or to defer to the Interior Board of Land Appeals (IBLA).  (ECF No. 116).  The Court dismissed or granted summary judgment on all claims against BOEM and the United States on September 3, 2012.  (ECF No. 156).  The Court also granted Apache's motion and dismissed Greenwich's cross-claim against Apache.  *Id.*

On May 28, 2013, the Court erroneously closed this adversary proceeding.  The case lay dormant for approximately one year until the United States filed a motion to withdraw the reference on May 6, 2014.  (ECF No. 169).  On September 9, 2014, the Court issued an order vacating its previous order closing the adversary proceeding and requesting status reports.  (ECF No. 176).  Following receipt of the status reports, the Court issued a new scheduling order on October 29, 2014.  (ECF No. 184).  The Court set a dispositive motion deadline for April 30, 2015, and abated the motion to withdraw the reference.

*The Competing Summary Judgment Motions*

The United States, on behalf of the Department of the Interior, BOEM, and BSEE, filed a motion for summary judgment on its claims against Greenwich on April 30, 2015.  (ECF No. 191).  It argues that the United States is entitled to payment from Greenwich on the three surety bonds totaling $3,900,000 pursuant to 30 C.F.R. § 556.59(c).  Alternatively, it argues that the Court stay all proceedings related to the surety bonds and refer the matter to the IBLA.

Greenwich also filed two motions for summary judgment on April 30, 2015.  The first motion requests that the Court grant summary judgment in favor of Greenwich over Tri-Union, PEG, and PEP's breach of contract claim and request for a permanent injunction.  Greenwich argues that it disbursed the escrow funds in accordance with the plain language of the Term Sheet and Turnkey Agreement.  The second motion requests that the Court grant summary judgment in favor of Greenwich over the United States' request for forfeiture of the surety bonds.  Greenwich argues that because Apache completed all P&A obligations, the request for forfeiture is moot.  Alternatively, Greenwich argues that the Forfeiture Orders are not final because they are still under review by the IBLA and any lawsuit to enforce them is premature.

### Jurisdiction and Authority

At a minimum, this Court possesses "related to" jurisdiction pursuant to 28 U.S.C. §§ 1334(b).  The Fifth Circuit has held that "it is not necessary to distinguish between proceedings 'arising under,' 'arising in a case under,' or 'related to a case under' title 11." *Wood v. Wood (In re Wood)*, 825 F.2d 90, 93 (5th Cir. 1987).  The Fifth Circuit noted that § 1334(b)'s language operates "conjunctively to define the scope of jurisdiction." *Id.* Consequently, bankruptcy courts need only "determine whether a matter is at least 'related to' the bankruptcy." *Bass v. Denney (In re Bass),* 171 F.3d 1016, 1022 (5th Cir. 1999) (citing *Walker v. Cadle Co. (In re Walker),* 51 F.3d 562, 569 (5th Cir. 1995)); *In re Wood,* 825 F.2d at 93.

Although subject matter jurisdiction is proper in this Court, questions regarding the constitutional authority of an Article I bankruptcy judge must also be addressed.  Under *Stern v. Marshall*, the question of whether a bankruptcy court may enter final judgment in a case depends on whether the cause of action stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process.  131 S.Ct. 2594, 2618 (2011).  This adversary proceeding

contains state law claims and non-bankruptcy federal claims which would not necessarily be resolved in the claims allowance process.  However, the Supreme Court recently held that parties may consent to the bankruptcy court's adjudication of a so-called *Stern* claim without implicating Article III issues "when the parties knowingly and voluntarily consent to adjudication by a bankruptcy judge."  *Wellness Int'l Network v. Sharif*, 135 S.Ct. 1932, 1939 (2015).

On August 31, 2015, the Court ordered all parties to file a brief statement as to whether they consented to the entry of final judgment over any potential *Stern* claims.  All parties gave their consent to adjudication by a bankruptcy judge.  Accordingly, this Bankruptcy Court has authority to fully adjudicate this lawsuit.

### Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Fed. R. Bankr. P. 7056 incorporates Rule 56 in adversary proceedings.
 A party seeking summary judgment must demonstrate: (i) an absence of evidence to support the non-moving party's claims or (ii) an absence of a genuine dispute of material fact.  *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009); *Warfield v. Byron,* 436 F.3d 551, 557 (5th Cir. 2006).  A genuine dispute of material fact is one that could affect the outcome of the action or allow a reasonable fact finder to find in favor of the non-moving party.  *Royal v. CCC & R Tres Arboles, L.L.C.,* 736 F.3d 396, 400 (5th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

A court views the facts and evidence in the light most favorable to the non-moving party at all times.  *City & Cnty. of S. F., Cal. v. Sheehan*, 135 S.Ct, 1765, 1769 (2015).  Nevertheless, the Court is not obligated to search the record for the non-moving party's evidence.  *Malacara v.*

*Garber,* 353 F.3d 393, 405 (5th Cir. 2003).   A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record, showing that the materials cited do not establish the absence or presence of a genuine dispute, or showing that an adverse party cannot produce admissible evidence to support the fact.[4]   Fed. R. Civ. P. 56(c)(1).   The Court need consider only the cited materials, but it may consider other materials in the record.  Fed. R. Civ. P. 56(c)(3).  The Court should not weigh the evidence.   A credibility determination may not be part of the summary judgment analysis. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).   However, a party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.  Fed. R. Civ. P. 56(c)(2).  Moreover, the Court is not bound to search the record for the non-moving party's evidence of material issues.  *Am. Family Life Assur. Co. of Columbus v. Biles*, 714 F.3d 887, 896 (5th Cir. 2013).

"The moving party bears the burden of establishing that there are no genuine issues of material fact."  *Norwegian Bulk Transp. A/S v. Int'l Marine Terminals P'ship,* 520 F.3d 409, 412 (5th Cir. 2008).   The evidentiary support needed to meet the initial summary judgment burden depends on whether the movant bears the ultimate burden of proof at trial.

If the movant bears the burden of proof on an issue, a successful motion must present evidence that would entitle the movant to judgment at trial.  *Celotex Corp. v. Cattrett*, 477 U.S. 317, 326 (1986).   Upon an adequate showing, the burden shifts to the non-moving party to establish a genuine dispute of material fact.  Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 322-24.  The non-moving party must cite to specific evidence demonstrating a genuine dispute.  Fed.

---

[4] If a party fails to support an assertion or to address another party's assertion as required by Rule 56(c), the Court may (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for the purposes of the motion; (3) grant summary judgment if, taking the undisputed facts into account, the movant is entitled to it; or (4) issue any other appropriate order.  Fed. R. Civ. P. 56(e).

R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 324.  The non-moving party must also "articulate the manner in which that evidence supports that party's claim."  *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004).  Even if the movant meets the initial burden, the motion should be granted only if the non-movant cannot show a genuine dispute of material fact.  If the non-movant bears the burden of proof of an issue, the movant must show the absence of sufficient evidence to support an essential element of the non-movant's claim.  *Celotex*, 477 U.S. at 325.  Upon an adequate showing of insufficient evidence, the non-movant must respond with sufficient evidence to support the challenged element of its case.  *Id.* at 324.  The motion should be granted only if the nonmovant cannot produce evidence to support an essential element of its claim.  *Condrey v. Suntrust Bank of Ga.*, 431 F.3d 191, 197 (5th Cir. 2005).

### Analysis

I.   The United States' Motion for Summary Judgment Against Greenwich Is Granted

*Apache's Liability Is Not Senior to that of Greenwich*

The United States contends that there is no genuine dispute of material fact that all requirements for bond forfeiture pursuant to 30 C.F.R. § 556.59 have been met.  Section 556.59 delineates the proper procedure for the forfeiture of a bond securing a lease in the OCS.  It states, in pertinent part:

(a)  The Regional Director will call for forfeiture of all or part of the bond . . . if:

   (1) You (the party who provided the bond) refuse, or the Regional Director determines that you are unable to comply with any terms or condition of your lease; or

   (2) You default under one of the conditions under which the Regional Director accepts your bond, third-party guarantee, and/or other form of security/

(b) The Regional Director may pursue forfeiture of your bond without first making demands for performance against any lessee, operating rights owner, or other person authorized to perform lease obligations

(c) The Regional Director will:

  (1) Notify you, the surety on your bond or other form of security, and any third-party guarantor, of his/her determination to call for forfeiture of the bond, security, or guarantee under this section

    (i) This notice will be in writing and will provide the reasons for the forfeiture and the amount to be forfeited

    (ii) The Regional Director must base the amount he/she determines is forfeited upon his/her estimate of the total cost of corrective action to bring your lease into compliance

On April 29, 2011, BOEMRE notified Greenwich that Tri-Union was in default of its lease obligations on OCS-G 1249, that the estimated cost to bring the lease into compliance was $3,600,000.00, and that the default called for the forfeiture of Greenwich's two bonds covering OCS-G 1249.   (ECF No. 116-6).   The letter indicated that Greenwich could avoid forfeiture if Tri-Union demonstrated within five working days that it could bring the lease into compliance. *Id.*  Similarly, on May 20, 2011, BOEMRE notified Greenwich in writing that Tri-Union was in default for ROW OCS-G 11181 and called for the forfeiture of the ROW bond.[5]  (ECF No. 116-7).  There is no dispute that these letters complied with the requirements of 30 C.F.R. § 556.59.

Greenwich, in its cross-motion for summary judgment, argues instead that Apache's satisfaction of the P&A Obligations extinguished Greenwich's liability on the surety bonds.  This Court has previously held that suretyship rights "exist at common law" and Greenwich's surety

---

[5] Greenwich has previously denied that "any such area-wide Bond issued by Greenwich in BOEM's favor actually covered [ROW OCS-G 11181]."  (ECF No. 128 at 6).  Because Greenwich has not re-urged this assertion, it may have conceded the point.   In any event, Bond # 45035259 provides on its face that it "shall pertain to any grant of right-of-way issued, maintained, or approved under the Outer Continental Shelf Lands Act . . . whereunder the principal has been granted the right to conduct pipeline operations in the Outer Continental Shelf, within the geographical area specified in Schedule A [Gulf of Mexico]."  (ECF No. 116-2 at 4).  Tri-Union (the principal) was the record title interest holder of ROW OCS-G 11181 in the Gulf of Mexico.  (ECF No. 191-2).  Accordingly, Bond # 45035259 encompasses ROW OCS-G 11181.

bonds are "little more than an acknowledgement of the rights provided at common law, and an effort to make those rights more predictable." *In re Tri-Union Dev. Co.*, 314 B.R. 611, 619 (Bankr. S.D. Tex. 2004) (citing *Memphis & L.R.R. Co. v. Dow*, 120 U.S. 287, 301-02 (1887)). Greenwich, in support of its assertion that is obligations have been extinguished seizes upon a foundational principle of the common law of surety: "the obligee is only entitled to one aggregate performance." Restatement (Third) of Suretyship & Guaranty § 19 cmt. a (1995).[6] In other words, "[t]he defenses of the principal are available to the surety, and if the underlying debt is cancelled, the surety's obligation ceases." *Nat'l Union Fire Ins. Co. v. Alexander*, 728 F.Supp. 192, 198 (S.D.N.Y. 1989) (citing *Asociacion de Azucarereros de Guatemala v. U.S. Nat'l Bank of Or.*, 423 F.2d 638, 641 (9th Cir. 1970). All parties are in agreement that Apache finished the P&A Obligations. Greenwich posits that BOEM, as obligee, received one performance from Apache and is entitled to no more.

The Court first notes that when BOEM issued the forfeiture orders in early 2011, the P&A Obligations had unquestionably not been performed. Greenwich resisted forfeiture of the bonds both by appealing the forfeiture orders to the IBLA and by filing suit in this Court against the United States for breach of contract. After two more years of delay, Apache—itself liable for the P&A Obligations due to its status as predecessor-in-interest—had no choice but to complete the work itself. Greenwich even acknowledges that it "originally had a choice either to pay or perform." (ECF No. 208 at 7). Instead, it chose to delay payment and hope that its liability would be extinguished. This the Court cannot allow.

---

[6] When the United States is a party to a suretyship transaction, the federal common law of suretyship governs. *United Pac. Ins. Co. v. U.S. Dep't of the Interior*, 70 F.Supp.2d 1089, 1097 (C.D. Cal. 199); *United States v. Martinez*, 151 F.3d 68, 73 (2d. Cir. 1998). Federal common law incorporates general principles of suretyship law as well as the Restatement (Third) and non-conflicting state law. *Wash. Int'l Ins. Co. v. United States*, 138 F.Supp.2d 1314, 1330 (Ct. Int'l Trade 2001).

Nor is Greenwich correct that the surety bonds merely ensured the completion of the P&A Obligations.  Rather, they mandate that Greenwich is liable for all costs of the P&A Obligations up to the amount of the bonds.  If the priority of payment obligations are established by agreement of the parties, suretyship law defers to those priorities.  Restatement (Third) of Suretyship & Guaranty § 6 (1996).  Under the terms of the surety bond, Greenwich agreed to "absolutely and unconditionally bind itself to the United States of America . . . for the payment of all of the cost of the plugging and abandonment Obligations."  (ECF No. 116-1 at 4).  Greenwich also agreed that "in the event of any default under a lease, the Surety must perform the Obligations of the Principal upon demand by the MMS.[7]"  *Id.* at 5.

Greenwich has not paid all—or any—of the cost of the P&A Obligations.  And when BOEM demanded that Greenwich "bring the lease into compliance," it failed to do so.  Greenwich has breached its obligations under the plain language of the surety bonds.  Because Greenwich has not paid for the P&A Obligations up to the amount of its bonds, it is still liable to BOEM.  Pursuant to 30 C.F.R. § 556.59(a)(2), the Regional Director of BOEM may call for forfeiture of a bond if the surety "default[s] under one of the conditions under which the Regional Director accepts your bond."  Once a bond is forfeited, the Director may "use the funds collected to bring your leases into compliance *and to correct any default*."  *Id.* § 556.59(e)(2) (emphasis added).  The term default, as used here, must refer to a default under the terms of a surety bond as well as a default on the underlying lease.  If it did not, it would lead to an absurd result wherein the Regional Director could call for forfeiture for a default on a bond condition, but would be powerless to correct the default.

---

[7] Bond Nos. 45035257 and 45035256 both contain those identical provisions.  Bond No. 45035259 does not contain the quoted language, but includes a provision which states, "if said principal shall in all respects faithfully comply with all of the provisions of the instrument referred to hereinbefore, then the above obligations are to be void; otherwise to remain in full force and effect."  Tri-Union did not faithfully perform its P&A Obligations, meaning Greenwich's obligations remain in full force and effect.

BOEM is not attempting to seek a double satisfaction, as Greenwich asserts, but rather it "will determine the allowability of the P&A costs and distribute those funds as appropriate to those entities that bore the burden that was Greenwich's." (ECF No. 195 at 8). If BOEM takes the position that its regulations allow it to distribute the bond proceeds, the Court must defer to BOEM's interpretation of its own regulations unless an alternative reading is compelled by the regulation's plain language. *Elgin Nursing Rehab. Ctr. v. U.S. Dep't of Health and Human Servs.*, 718 F.3d 488, 491 (5th Cir. 2013) (citing *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 514 (1994). As discussed above, BOEM's interpretation comports with the plain language of the regulation. Accordingly, BOEM may correct the default by distributing the funds to the proper parties.

Greenwich questions whether BOEM can rightfully disburse the funds to Apache because Apache "is a principal obligor that is directly and originally liable for the Debtors' P&A Obligations." (ECF No. 208 at 3). Greenwich argues that its liability is secondary to that of Apache. This is a misstatement of Apache's legal status. The Code of Federal Regulations states that predecessors-in-interest such as Apache will only be secondarily liable for lease obligations. "If your assignee, or a subsequent assignee, fails to perform any obligation under the lease or the regulations in this chapter, the Regional Director may require you to bring the lease into compliance to the extent that the obligation accrued before the Regional Director approved the assignment of your interest in the lease." 30 C.F.R. § 556.62(f). Plainly, Apache was only required to bring the lease into compliance once Tri-Union defaulted. The Term Sheet—signed by Greenwich—also establishes that Apache was not a principal obligor. "MMS agrees to demand forfeiture of the Greenwich bonds (which include for Phase 2 Properties both the remaining area wide and ST 162 lease specific) and MMS lease specific escrows *before*

*pursuing* any potential claim for P&A from Apache and its predecessors in interest. . . .[8]" (ECF No. 193-3 at 39) (emphasis added).

In addition, the Purchase and Sale Agreement between Apache and Tri-Union, Tri-Union expressly agreed to pay, perform, fulfill, and discharge all environmental obligations related to the offshore leases and indemnify Apache for the same.  (Proof of Claim No. 251 Ex. 1 at 30).  Relying on this provision, the Court has already held that Greenwich's obligation to pay for the P&A Obligations is senior to Apache's.  By finding that Greenwich had no subrogation claim against Apache, the Court stated:

> Apache filed a proof of claim against Tri-Union.  The proof of claim demonstrates that—as between Tri-Union and Apache—Tri-Union had the primary duty to perform the P&A Obligations.  The issue is not one in genuine dispute.  Accordingly, Greenwich (as the issuer of surety bonds) and Apache (as the predecessor-in-interest) are both secondary obligors to Tri-Union.
>
> Greenwich assured only Tri-Union's obligation, not Apache's.  If Greenwich pays Tri-Union's obligation to BOEM, then Greenwich may be subrogated to BOEM's rights with respect to Tri-Union's obligation.  Restatement (3d) of Suretyship and Guaranty § 27.
>
> The suretyship rights of secondary obligors are well established by the Restatement (3d) of Suretyship and Guaranty.  The Court relies primarily on §§ 55-59 of the Restatement.  Section 59 provides that—as between two sureties—a senior surety will have no claims against a secondary surety.  In the present case, Greenwich accepted the duty to pay Tri-Union's obligations to the MMS.  Rather, equitable principles dictate that Greenwich—having paid as a surety for Tri-Union—is governed by equitable principles to bear the primary loss.  It has no subrogation claim against Apache unless it pays a greater amount than its bond.

(ECF No. 155 at 24) (internal references omitted).

In the interest of clarification, Apache is not a true secondary surety.  "A suretyship . . . result's where a debtor's obligation has been assumed by someone else."  *Kessenich v. Raynor*,

---

[8] Greenwich argues that this provision does not establish a hierarchy of payment but merely explains how BOEM, as principal obligee, could seek satisfaction of the P&A Obligations.  The Court fails to understand how a provision which establishes the order in which the principal obligee may seek satisfaction *does not* establish a hierarchy of payment.

169 F.Supp.2d 119, 122 (E.D.N.Y. 2001) (citing 74 Am. Jur.2d Suretyship § 8).  Apache has not assumed Tri-Union's P&A Obligations, but rather is independently obligated for the P&A work. *See* 30 C.F.R. § 556.62(d).  As set forth above, however, Apache's liability is secondary to that of Tri-Union.  Greenwich's liability must come before Apache's because Greenwich accepted the duty to pay Tri-Union's obligations.

Because Apache performed the P&A Obligations on behalf of Greenwich and Tri-Union, it is entitled to repayment.[9]  Both Greenwich and Apache were secondary obligors to Tri-Union, with Greenwich's liability capped at its contribution, i.e. the $3.9 million in surety bonds. *Between* Greenwich and Apache, Greenwich was the primary obligor up to $3.9 million and Apache was secondary obligor.  Apache bore primary responsibility (vis-à-vis the United States) for any amount beyond the $3.9 million.  Rather than wait for the resolution of a lawsuit between Apache and Greenwich, BOEM proposes to cure Greenwich's default by distributing the funds to the parties who paid for the P&A work.  Apache is amenable to this arrangement and, as discussed above, it is within the scope of the C.F.R.

---

[9]  The Restatement (Third) of Suretyship & Guarantyship suggests two possible remedies against Greenwich. "When a subsurety performs its secondary obligation, it has claims against two persons—the principal obligor and the principal surety."  Restatement (Third) § 60 cmt. a (1996).  Apache, while citing comment (a), states that "the only claim that Apache can assert against Greenwich is from the proceeds of the Greenwich's [sic] P&A bonds." (ECF No. 196 at 10).  The Court does not understand why Apache's claim would be limited to the actual proceeds of the bonds themselves instead of the claim being limited to the *amount* of the bond.  Nevertheless, the Restatement also suggests that when a secondary obligor satisfies the underlying obligation, "the secondary obligor is subrogated to the obligee's rights with respect to the underlying obligation, including the obligee's rights against the principal surety."  Restatement (Third) § 59 cmt. e (1996).

Equitable subrogation applies "in every instance in which one person, not acting voluntarily, has paid a debt for which another was primarily liable and which in equity should have been paid by the latter." *Frymire Eng'g Co. ex rel. Lib. Mut. Ins. Co. v. Jomar Int'l, Ltd.*, 259 S.W.3d 140, 142 (Tex. 2008).  According to this doctrine, the excess insurer who pays an obligation 'stands in the shoes' of its insured with regards to any cause of action its insured may have against a primary insurer responsible for the loss. *Gen Star Indem. Co. v. Vesta Fire Ins. Corp.*, 173 F.3d 946, 949 (5th Cir. 1999).  In other words, Apache can be subrogated to the rights of BOEM against Greenwich and call for forfeiture of the surety bonds.  Apache questions whether it can demand forfeiture of the surety bonds, however, as this Court previously held that Apache cannot be subrogated to the police powers of BOEM. *In re Tri-Union Dev. Corp.*, 314 B.R. 611, 622 (Bankr. S.D Tex. 2004).  Apache incorrectly believes that this Court held that forfeiture of a surety bond is within BOEM's exclusive police power.

*The Bond Forfeiture Orders Are Not Moot*

Greenwich's second argument against bond forfeiture is that Apache's performance of the P&A Obligations has mooted BOEM's demand for the $3,900,00.00.  It argues that because Apache actually expended $14,186,587.00 to complete Phase 2, BOEM's original estimate that Phase 2 would cost $3,900,000.00 is now moot.  Greenwich contends that the cost of completion is now zero because the work is already complete.  It then cites 30 C.F.R. § 559.56(g) for the proposition that once BOEM collects the bond, it will be required to return the funds to Greenwich in their entirety.[10]

This argument is merely a repackaged version of Greenwich's first argument.  The cost of completion is not zero, it is $14,186,587.00.  Greenwich's argument only makes sense if Apache is the principal obligor and Greenwich the secondary.  Indeed, Greenwich cites the Restatement for the proposition that partial performance by the principal obligor discharges the secondary obligor to the extent of that performance.  Restatement (Third) of Suretyship & Guaranty § 39 cmt. e (1996).  Greenwich again inverts the relation of the parties.  Because Greenwich is the principal obligor with regards to Apache, it is liable for the cost of the P&A Obligations up to the amount of the bonds.  The fact that Apache completed the P&A Obligations is immaterial.  Section 556.59(g) does not apply because the cost of taking corrective action far exceeds the face value of the bonds.  The bond forfeiture orders are not mooted because Greenwich's liability to pay for the P&A Obligations continues despite Apache's performance.

---

[10] Section 556.59(g) provides that: "The amount that the Regional Director collects under your forfeited bond and other security may exceed the costs of taking the corrective actions required to obtain full compliance with the terms and conditions of your lease and the regulations in this chapter.  In this case, the Regional Director will return the excess funds to the party from whom they were collected."

*The Defense of Impairment of Suretyship Does Not Apply*

Greenwich argues in the alternative that even if Greenwich's liability survives Apache's performance, BOEM may not collect upon the bonds because it has impaired Greenwich's right of surety and increased the risk of loss.  The defense of impairment of suretyship (also known as a claim for *pro tanto* discharge) states that a surety's obligations are discharged if the obligee takes improper actions which prejudiced the surety by increasing financial risk.  *Lumbermens Mut. Cas. Co. v. United States*, 654 F.3d 1305, 1313 (Fed. Cir. 2011).  Impairment of suretyship occurs "if the obligee acts to increase the secondary obligor's risk of loss by increasing its potential cost of performance or decreasing its potential ability to cause the principal obligor to bear the cost of performance. . . ."  Restatement (Third) of Suretyship & Guaranty § 37 (1996).  If the surety's risk factor is increased by a factor which cannot be measured, the surety is discharged entirely; otherwise it is discharged only to the extent of its loss.  *Lumbermens*, 654 F.3d at 1313.

The critical question on impairment is whether an act of the obligee fundamentally altered the risks imposed on the obligor.  *United States v. Great Am. Ins. Co. of N.Y.*, 791 F.Supp.2d 1337, 1360 (Ct. Int'l Trade 2011).  "In order for there to be an impairment of suretyship such that the surety is discharged of its obligation, the increase in the surety's risk must be material." *Id.*  Greenwich argues that BOEM (MMS at the time) impaired Greenwich's interest as a surety by failing to enforce its own orders.  Specifically, on December 13, 2005, MMS requested that Tri-Union provide a schedule for the timely removal of South Timbalier Block 162.  After Tri-Union requested a time extension, MMS gave it until June 30, 2006, to provide an abandonment schedule.  (ECF No. 197-3).  Tri-Union failed to meet this deadline and

MMS granted another extension until March 31, 2007.  (ECF No. 197-8).  Predictably, the 2007 deadline came and went with no action on the part of Tri-Union.

Throughout this time period, Greenwich alleges that the Phase 2 Escrow contained sufficient funds to complete the P&A Obligations.  In June of 2005, the Escrow had a balance of approximately $3 million with an additional $500,000 in Tri-Union's Operating Account.  (ECF Nos. 197-9 and 197-10).  Tri-Union estimated that the cost to decommission ST 162 was only $2.5 million in June of 2006, a figure which represented a "significant increase" over the cost in 2005.  (ECF No. 197-6).  According to Greenwich, if BOEM had ordered Tri-Union to perform in 2005 or 2006, ST 162 could have been decommissioned solely by using funds from the Phase 2 Escrow.  Instead, the work was put off for years and Apache ultimately spent $9,661,308 to decommission the ST 162 platform.  (ECF No. 197-14 at 6).

Greenwich is correct that a surety may have a claim, in certain circumstances, against the government for impairment of suretyship.  In *United Pacific Insurance Company v. United States Department of the Interior*, the court held that surety on a bond to ensure payment on contracts for the purchase of royalty oil, issued in favor of MMS could offset its obligation under the bond by the amount that MMS had impaired the surety's rights by failing to file a timely bankruptcy claims.  70 F.Supp.2d 1089, 1099 (C.D. Cal. 1999).  However, further examination of case law makes clear that the application of *pro tanto* discharge against the government is extremely limited.

In ruling on the issue of *pro tanto* discharge where a surety claimed the government wrongfully released performance bonds to a contractor, the Federal Circuit has stated:

> The Claims Court recognized that it is unprecedented in this court to apply the *pro tanto* discharge rule to government contracts. . . . As recited by the Claims Court and emphasized by Fireman's Fund, "[i]t is well-settled in many jurisdictions that *if the obligee departed from or altered the contractual provisions relating to*

> *payments and/or the security of retained funds*, a surety is discharged from its
> obligations only to the extent it can show injury, loss, or prejudice." Thus, for the
> rule to operate to Fireman's Fund's benefit, the government *must have departed
> from the terms of the bonded contract*.

*Fireman's Fund Ins. Co. v. United States*, 909 F.2d 495, 497 (Fed. Cir. 1990) (emphasis added)

(internal citations omitted).

Greenwich is attempting to impose a duty to act upon the government where none

existed.  It voluntary entered into a suretyship arrangement with Greenwich in exchange for

payment, by which it agreed to shoulder the risk of Tri-Union defaulting.  Greenwich "simply

cannot rely on . . . the government to protect its interests.  By definition and agreement, the

surety protects the government's interest, not the other way around."  *Fireman's*, 909 F.2d at

499.  This Court has already held that BOEM had no duty per the Term Sheet, Turnkey

Agreement, or the applicable statutes and regulations to enforce Tri-Union and Palm's deadlines

for the P&A Obligations.  *Palm Energy Grp., LLC v. Greenwich Ins. Co. (In re Tri-Union Dev.

Co.)*, 479 B.R. 425, 440 (Bankr. S.D. Tex. 2012).  Consequently, Greenwich's request for a *pro

tanto* discharge must be denied.

*The United States Is Not Seeking Judicial Review of Agency Action*

Greenwich's final argument is that because the Forfeiture Orders remain on appeal before

the IBLA they do not constitute a final agency action.  Section 702 of the Administrative

Procedures Act provides that "a person suffering legal wrong because of agency action, or

adversely affected or aggrieved by agency action within the meaning of a relevant statute, is

entitled to judicial review thereof.  5 U.S.C. § 702.  Section 704 then states that "[a]gency action

made reviewable by statute and final agency action for which there is no other remedy in court

are subject to judicial review." *Id.* § 704.  Agency action is defined to include "the whole or a

part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or

failure to act. . . ." *Id.* § 551(13).  Person is defined as "an individual, partnership, corporation, association, or public or private organization *other than* an agency."  *Id.* § 551(3) (emphasis added).  Final agency action, as used in § 704, must be "the consummation of the agency's decisionmaking process . . . [and] must be [an action] by which rights or obligations have been determined, or from which legal consequences will flow."  *Bennett v. Speer*, 520 U.S. 154, 178 (1997).

Section 704 of the APA is a codification of the rule that plaintiffs must exhaust administrative remedies before seeking judicial review.  *Friends of Crystal River v. E.P.A.*, 794 F.Supp. 674, 687 (W.D. Mich. 1992).  "The basic purpose of the exhaustion doctrine is to allow an administrative agency to perform functions within its special competence—to make a factual record, to apply its expertise, and to correct its own errors so as to moot judicial controversies."  *Parisi v. Davidson*, 4005 U.S. 34, 37 (1972).  It prevents unnecessary litigation when a claim can instead be resolved administratively.  *Hunter v. United States*, 417 F.Supp. 272, 274 (N.D. Cal. 1976).

Most notably, the Court is not conducting a judicial review of an agency action.  The United States, acting on behalf of BOEM, is the plaintiff in this action, not Greenwich.  By statute, BOEM cannot seek judicial review of agency action because it is not a person as defined by the APA.  The United States is seeking a judgment against Greenwich based on its enforcement of the surety bonds.  It is not seeking judicial review *of its own actions.*  In *United States v. Smith*, the government brought an action against a social security disability claimant who had been overpaid and refused to return the disbursements.  482 F.2d 1120, 1122 (8th Cir. 1973).  The court held that "[w]e do not have a claimant seeking judicial review under the act.

On the contrary we have the government, as plaintiff, seeking to reduce a debt to judgment and thereafter to collect." *Id.* at 1124. The United States is attempting to do the same here.

In accessing the validity of the debt, this Court must by necessity determine whether BOEM's Forfeiture Orders were valid and enforceable. But the primary purpose of this action is not to determine whether BOEM acted in an arbitrary and capricious manner, but rather to determine whether Greenwich must pay its fair share to Apache, thus lessening Tri-Union's liability. *See In re Healthback, L.L.C.*, 226 B.R. 464, 471 (Bankr. W.D. Okla. 1998) (stating that adjudication of the bankruptcy court over property of the estate is not directly concerned with any administrative decision but rather to ensure that all creditors are treated equally within the scope of the Bankruptcy Code). The bankruptcy court's jurisdiction in this matter is not precluded by the doctrine of exhaustion of administrative remedies.

Greenwich has not shown an issue of material fact. BOEM complied with the regulations in calling for forfeiture of the Greenwich bonds. The United States is entitled to judgment as a matter of law and is entitled to payment of the $3,900,000.00 owing on the surety bonds. Greenwich's motion for summary judgment against the United States is denied.

II. Greenwich's Motion for Summary Judgment Against Tri-Union, PEG, and PEP Is Granted in Part and Denied in Part

Greenwich has filed a separate motion for summary judgment for all of Tri-Union, PEG, and PEP's ("Plaintiffs") claims against it. Plaintiffs allege that Greenwich, as escrow agent, wrongfully refused to disburse certain funds from the Phase 2 Escrow to Plaintiffs. Plaintiffs have sued Greenwich for breach of contract and injunctive relief that Greenwich transfer all remaining funds in the Phase 2 Escrow to pay any unpaid vendors. Greenwich argues that the summary judgment record establishes that PEG did not finish decommissioning the Phase 2 Properties, a condition precedent to Greenwich releasing funds from the Phase 2 Escrow.

Consequently, it argues that Plaintiffs' breach of contract claim and request for injunctive relief must fail.

*The Contractual Provisions at Issue*

As discussed above, Tri-Union's bankruptcy plan incorporated a previously agreed Term Sheet signed by numerous stakeholders including Tri-Union, Greenwich, Apache, MMS and PEP which provided that the P&A Obligations would be performed in two phases.  (ECF No. 198-3 at 1).  The Term Sheet set forth the source of the funds to be used to conduct the decommissioning process.  Three escrows were established: the Phase 1 Escrow, the Phase 2 Escrow, and the Apache Escrow.  *Id.* at 3-7.  Greenwich was the escrow agent for the Phase 1 and Phase 2 Escrows.  With regards to the Phase 2 P&A Obligations, the Term Sheet states:

> Palm shall be entitled to a total of Six Million Six Hundred Thousand Dollars ($6,600,000) for Phase 2, to be paid in mutually agreeable segregable portions upon completion of the segregable portion of the P&A. . . . Payment to Palm for Phase 2 work . . . will be made as required from the Phase 2 Escrow and the Apache Escrow, as the case may be, in accordance with the terms of the Turnkey Contract and the respective Phase 2 Escrow and the Apache Escrow to be negotiated upon compliance with MMS regulations and certification requirements attributable to each of the Phase 2 properties' Obligations.

*Id.* at 3, 6.

On October 21, 2004, Tri-Union, PEP, and PEG executed a Turnkey Agreement which provided that PEG, a wholly owned subsidiary of PEP, would perform the P&A Obligations as an independent contractor.  (ECF No. 198-2 at 1).  The Turnkey Agreement states that "[i]n consideration for Work performed by [PEG], [PEG] shall be paid from escrow account(s) pursuant to escrow agreement(s) on the forms attached, in globo, as **Exhibit B**. . . ."  *Id.* at 2.  It stated further that "[PEG] shall be entitled to a total of [$6,600,00] for the P&A Activities associated with the Phase 2 Properties, to be paid when P&A is performed for each property set

forth  in Exhibit A-2 and in the installments set forth in Exhibit A-2. . . .[11] Palm may utilize the

Phase 2 Escrow to secure and pay for work commitments with the consent of Greenwich."  *Id.* at

15.

PEP, PEG, and Greenwich executed the Phase 2 Escrow Agreement also on October 21,

2004.  (ECF No. 198-4).  The Escrow Agreement "governs the terms and conditions upon which

the Escrow Agent will hold and disburse the funds . . . for the payments out of the Offshore

Production Proceeds required under the Term Sheet and the performance of the P&A Activities

at the Phase II Properties. . . ."  *Id.* at 2.  Funds were to be disbursed:

> Upon receipt by Escrow Agent of a written notice from [PEG] signed by a [PEG]
> representative shown on Exhibit "B" hereto, as amended from time to time,
> stating that a segregable portion of the P&A Activities associated with one or
> more Phase II Properties has been performed and completed by [PEG] in
> accordance with Exhibit A-2 of the Turnkey Agreegment, *and* accompanied by . .
> . a writing from the MMS advising that the P&A Activities associated with such
> Stage of Completion . . . the Escrow Agent shall disburse to the Plan Agent by
> wire transfer of immediately available funds into a separate deposit account. . . .

*Id.* at 3.  The Escrow Agreement also contained a provision for advance disbursements of funds

to prepay contractors or other suppliers.  PEG would make a written request and provide copies

of contracts, invoices, etc. evidencing the proposed work.  *Id.* at 4.  If Greenwich approved the

prepayment amount and the contractor or supplier, it would make a disbursement.  Greenwich

agreed not to unreasonably withhold approval.  *Id.*  The parties agreed that any prepayment

amount would not exceed the installment amount as set forth on Exhibit A-2 to the Turnkey

Agreement.  *Id.*  Finally, "[a]fter completion of the P&A Activities on all Stages of Completion

with respect to the Phase II Properties (regardless if that work is done by Palm or a farmee), all

escrowed funds remaining in the Phase II Escrow Account shall be disbursed to the Plan Agent."

*Id.*

---

[11] Exhibit A-2 listed 17 discrete wells, platforms, and pipelines associated with South Timbalier 162 and High Island
A537/556, the Phase 2 properties.  It also included an installment amount attributable to each discrete property.

Finally, on November 14, 2004, Tri-Union, PEG, PEP, and Greenwich executed a Security Agreement to create a security interest in favor of Greenwich over the funds in the Phase 1 and Phase 2 Escrows. (ECF No. 198-5). Greenwich was granted a first priority security interest in the Escrows, "subject only to a subordinate security interest in favor of Apache Corporation, *and to the rights of [PEG]* and other third parties to receive payments therefrom in accordance with the terms and conditions of the Turnkey Agreement and the Escrow Agreements, as set forth in Section 3.2 hereof." *Id.* at 4 (emphasis added).

It is apparent that the four contracts at issue—the Term Sheet, the Turnkey Agreement, the Escrow Agreement, and the Security Agreement—provide that PEG would be paid only after completing a segregable portion of the Phase 2 P&A Obligations and providing to Greenwich written notification of BOEM's satisfaction. However, PEG could also request pre-payments from Greenwich to pay contractors and vendors and Greenwich could not refuse unreasonably. At the completion of Phase 2, all remaining funds in the Phase 2 Escrow would be released to PEG.

*Choice of Law*

As a preliminary matter, the Court must decide what law applies. Under the OCSLA, "to the extent that they are applicable and not inconsistent with this subchapter or with other Federal laws and regulations of the Secretary now in effect or hereinafter adopted, the civil and criminal laws of each adjacent State . . . are declared to be the law of the United States for that portion of the subsoil and the seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon, which would be within the area of the State if its boundaries were extended seaward. . . ." 43 U.S.C. § 1333(a)(2)(A). The Fifth Circuit has adopted a three part test to determine if state law applies: "(1) [t]he controversy must arise on a situs covered by the

OCSLA . . . . (2) Federal maritime law must not apply of its own force. (3) The state law must not be inconsistent with Federal law." *Union Tex. Petroleum Corp. v. PLT Eng'g, Inc.*, 895 F.2d 1043, 1047 (5th Cir. 1990).

The first requirement is met because this dispute centers on a contractual dispute over work performed on fixed platforms and undersea wells located on the subsoil and seabed of the Outer Continental Shelf. As the contracts do not relate to "ships and vessels, masters and mariners, as the agents of commerce," federal maritime law does not apply. *Kossick v. United Fruit Co.*, 365 U.S. 731, 736 (1961). Finally, no conflict with federal law is evident.

The Phase 2 properties at question are adjacent to both Texas and Louisiana: South Timbalier 162 to Louisiana while the High Island properties border Texas. As the parties are in agreement that the relevant Texas and Louisiana laws are in harmony, it is not necessary to choose between Texas and Louisiana law.[12]

*Plaintiffs Have Raised a Fact Issue as to an Excuse for Failure to Perform*

Greenwich's first argument in favor of summary judgment is that Plaintiffs are themselves in material breach of the relevant contracts and cannot maintain a suit for breach of contract. In Texas, the elements of a breach of contract claim are as follows: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) resulting damages to the plaintiff.[13] *Rice v. Metro. Life Ins. Co.*, 324 S.W.3d 660, 666 (Tex. App.—Fort Worth 2010, no pet.). It is well established in both states that "a party to a contract who is himself in breach cannot maintain suit for its breach."

---

[12] Although the Escrow Agreement chooses Louisiana law and the bankruptcy plan itself chooses Texas law, these provisions are not relevant. "We find it beyond any doubt that OCSLA is a Congressionally mandated choice of law provision requiring that the substantive law of the adjacent state is to apply even in the presence of a choice of law provision in the contract to the contrary." *Union Tex.*, 895 F.2d at 1050.

[13] Similarly, the elements in Louisiana are "the existence of a contract, a party's breach thereof, and damages." *Hercules Machinery Corp. v. McElwee Bros., Inc.*, 2002 WL 31015598 (E.D. La. Sept. 2, 2002).

*Dobbins v. Redden*, 785 S.W.2d 377, 378 (Tex. 1990); *see also Lundy v. S. Pfeifer & Co.*, 110 So. 556, 557 (La. 1926) ("[a] plaintiff must first show compliance with his obligation under the contract before he can appeal to the courts for the enforcement of the obligations assumed by the other party to it.").

All parties are in agreement that PEG did not complete the Phase 2 P&A Obligations. Greenwich argues that completion of the P&A work was a condition precedent which had to be satisfied before a right to sue for breach of contract could arise. *Beard Family P'ship v. Commercial Indem. Ins. Co.*, 116 S.W.3d 839, 844 (Tex. App.—Dallas 2005, no pet.) (citing *Centex Corp. v. Dalton*, 840 S.W.2d 952, 956 (Tex. 1992). Greenwich is correct that the Term Sheet, Turnkey Agreement, and Escrow Agreement all indicate that PEG would be entitled to payment only once a segregable portion of Phase 2 was completed and BOEM gave written approval. Greenwich also notes that by its very name, the Turnkey Agreement implies that PEG cannot sue for breach because it did not complete the agreed upon work. "A turn-key job is defined as a job or contract in which the contractor agrees to complete the work of the building and installation to the point of readiness for operation or occupancy." *Chapman & Cole v. Itel Container Int'l B.V.*, 865 F.2d 676, 681 (5th Cir. 1989) (internal quotations omitted) (quoting *Hawaiian Indep. Refinery, Inc. v. United States*, 697 F.2d 1063, 1065 n. 4 (Fed. Cir. 1983). PEG did not complete the P&A Obligations to the point of readiness.[14]

---

[14] Greenwich also argues that Plaintiffs breached the Escrow Agreement by failing to properly fund the Phase 2 Escrow. Pursuant to the terms of the Escrow Agreement, "commencing with the effective date of the Plan, Tri-Union will cause all of its share of proceeds from the sale of production from South Marsh Island 255, South Pass 37 and West Cameron 66 ("Offshore Production Proceeds"), less the first $900,000 of Offshore Production Proceeds which shall be deposited into the Phase I Escrow Account administered by Escrow Agent, to be delivered to the Escrow Agent on a monthly basis for deposit into the Phase II Escrow Account." (ECF No. 198-4 at 2). Greenwich alleges that Plaintiffs received $412,640.33 in proceeds from the above wells on September 21, 2006, but deposited those funds into the Debtor Operating Account rather than the Phase 2 Escrow Account. It further alleges that Plaintiffs did not deposit $625,000 in insurance proceeds from damage to South Timbalier 162 into the Phase 2 Escrow.

Of course, the title of a contract must give way to the actual terms of the contract.  The Turnkey Agreement stated that PEG could utilize the escrow funds to secure and pay for work commitments with Greenwich's consent.  It also stated that funds were to be paid out of the Phase 2 Escrow pursuant to the Escrow Agreement.  The Escrow Agreement, in turn, was to "govern[]the terms and conditions upon which the Escrow Agent will hold and disburse the funds. . . ."  (ECF No. 198-4 at 2).  Under the terms of the Escrow Agreement, PEG could request that Greenwich disburse funds in advance to pay contractors and vendors.  Greenwich could not refuse these requests "unreasonably."

Plaintiffs have pointed to several such prepayment requests in the record.  On October 20, 2009, a PEP employee wrote to counsel for Greenwich regarding PEG's plans to decommission the High Island Block A-537 D Platform and the South Timbalier Block 162 A Platform.  (ECF No. 198-8).  Because Tri-Union's Working Capital Account only showed a balance of $628,056.20 and the estimated cost of the work was $750,000, the letter stated "[t]he selected vendors for this operation will require prepayments . . . & it will be necessary to access the funds in the Greenwich Phase II escrow account under the same process that was utilized during the Phase I abandonment operations in 2005."  *Id.*  On April 22, 2010, Plaintiffs' counsel sent a second letter to Greenwich's counsel, which stated:

> [w]e have requested on numerous occasions that Greenwich Insurance Company consent to a transfer of the remaining funds in the 'Phase II' escrow

---

These allegations may be correct.  However, it is unclear if insurance proceeds resulting from hurricane damage constitute "proceeds from the sale of production" as defined by the Escrow Agreement.  In addition, although the Debtor Operating Account statement indicates that $412,640.33 was deposited into the account on September 21, 2006, the source of those funds remains unclear, despite Greenwich's representation.  (ECF No. 212-8 at 5).  Plaintiffs assert that the Phase 2 Escrow was not fully funded because Hurricanes Katrina and Rita halted production on the wells which were to fund the escrow.  (ECF No. 198 at 14; ECF No. 198-11 at 2).  The contracts only obligated Plaintiffs to deposit *proceeds* from the wells into the Escrow Account, not a specific dollar amount.  If the wells did not operate, it follows that there would be no proceeds.  A genuine issue of material fact exists as to when the wells in question stopped operating and why proceeds were not deposited into the Phase 2 Escrow Account.

> (approximately $520,000.00) to the [Tri-Union] operating account so that all presently due and payable invoices (see Attachment 1) which have been received but remain unpaid can be satisfied. Failure of Greenwich to consent to such a transfer has caused injury to [Plaintiffs], and is now also affecting other businesses owned by William M. Gray and Jonathan C. Garrett, and no justifiable reason exists for this failure. Consequently, we hereby demand that such a transfer be made immediately.

(ECF No. 198-9).

Greenwich rejected this request, arguing that PEG had already spent more than $584,000.00 on the High Island A-556 wells, in excess of the $425,000.00 earmarked for the completion of those wells.[15]  (ECF No. 198-10).  While Greenwich's statement in its letter that Exhibit A-2 to the Turnkey Agreement designated only $425,000.00 for *wells* "OCS-G 6238 D1 and D2", the invoice attached to the letter actually references "OCS-G 2698 HI A537D # D1 and D2."  Exhibit A-2 earmarks a total of $1,595,000.00 for the "HI A-537 D" *platform*.  Given that the grand total of the invoice was $1,229,096.93, it is possible that the invoice referred to the platform rather than the wells.  (ECF No. 198-2 at 28).  Furthermore, it would be strange for PEG to refer to the HI-556 wells in the invoice as "OCS-G 2698 HI A537D # D1 and D2", because in the October 20, 2009, letter, PEP explicitly referred to the wells as "OCS-G 6238 D001" and D002.  (ECF No. 198-8).

At the very least, there is a genuine issue of material fact as to whether Greenwich unreasonably denied PEG's requests for prepayment.  As early as October 20, 2009, PEP made a request for prepayment.  The April 22, 2010, letter indicates that PEG had made "numerous" requests for Greenwich to release the remaining funds in the Phase 2 Escrow.  It is unclear whether PEG had actually gone over budget for the High Island wells or if it had spent money on the High Island platform instead.  Plaintiffs have accordingly presented evidence that they made

---

[15] The April 22, 2010, letter contains an attachment which indicates that PEG paid a total of $584,097.07 for "OCS-G 2698 HI A537D #D1 and D2.  (ECF No. 198-9 at 4).  PEG requested an additional $612,102.36.

requests for the advance disbursement of funds, per the Turnkey Agreement and Escrow Agreement, which were denied by Greenwich.  The question of whether these denials were reasonable is inherently an issue of fact.  *See Lawrence v. TD Indus.*, 730 S.W.2d 843, 845 (Tex. App.—Dallas 1987, writ ref'd n.r.e.).

If Greenwich unreasonably denied PEG's requests for prepayment, the denial potentially excused Plaintiffs' nonperformance.  "It is a general principle of contract law that if one party to a contract prevents or makes impossible performance by the other party, the latter's failure to perform will be excused. . . ."  *Nitram, Inc. v. Cretan Life*, 599 F.2d 1359, 1371 (5th Cir. 1979). A party who shows a valid excuse may recover damages for breach of contract despite having failed to perform conditions precedent.  *Aetna Ins. Co. v. Durbin*, 417 S.W.2d 485, 487 (Tex. App.—Dallas 1967, no writ); *Acme Pest Control Co. v. Youngman*, 216 S.W.2d 259, 263 (Tex. App.—Waco 1948, no writ).  In Texas, it is a "long-standing rule that where a defendant openly refuses to perform his part of a contract, a plaintiff need not tender performance before bringing suit."  *17090 Parkway, Ltd. v. McDavid*, 80 S.W.3d 252, 256 (Tex. App.—Dallas 2002, pet. denied).  Similarly, in Louisiana, "a party is not required to tender a vain and useless performance where the other contracting party has announced that he will not honor the contract."  *Alliance Fin. Servs., Inc. v. Cummings*, 526 So.2d 324, 328 (La. App. 1988).  A defendant may not allege non-performance of a condition in defense when it was the defendant's fault that the condition was not performed.  *George W. Garig Transfer, Inc. v. Harris*, 75 So.2d 28, 32 (La. 1954).  Summary judgment is not appropriate based on Plaintiffs' nonperformance. To the extent Greenwich seeks to bar a breach of contract claim based on its denial of prepayment requests, the summary judgment motion is denied.

*Plaintiffs May Not Recover Damages Based on the Entire Value of the Contract*

Plaintiffs argue further that, regardless of any excuse they may have had for nonperformance, all conditions precedent have been met and Plaintiffs are entitled to their due consideration as set forth in the Term Sheet and Turnkey Agreement.  The Turnkey Agreement states that "[PEG] *shall* be entitled to a total of Six Million Six Hundred Thousand Dollars ($6,600,000) for the P&A Activities associated with the Phase 2 Properties, to be paid when P&A is performed for each property set forth in Exhibit A-2. . . ."  (ECF No. 198-2 at 12).  The Term Sheet states that "Phase 2 funding *shall* be Six Million Six Hundred Thousand Dollars ($6,600,000)."  (ECF No. 198-3 at 6).  Finally, the Escrow Agreement states that once Phase 2 was completed, "regardless if that work was done by Palm or a farmee," all remaining funds in the Phase 2 Escrow would be returned to PEG.

It is undisputed that Apache has completed the Phase 2 P&A Obligations.  Plaintiffs contend that because all conditions precedent have been satisfied, they are entitled to the full consideration of $6,600,000.[16]  But the contracts clearly contemplated that it would be PEG who performed the work, not a third party.  As the Turnkey Agreement states, "[i]n consideration for Work *performed by [PEG]*, [PEG] shall be paid from escrow account(s) pursuant to escrow agreement(s). . . ."  (ECF No. 198-2 at 2).  The Escrow Agreement also provides that, "[u]pon receipt by Escrow Agent of a written notice from [PEG] signed by a [PEG] representative . . . stating that a segregable portion of the P&A Activities associated with one or more Phase II Properties has *been performed and completed by [PEG]*" the funds would be disbursed to PEG. (ECF No. 198-4 at 3).

---

[16] Plaintiffs do admit that BOEM has not given its written acceptance of Apache's work, meaning that all conditions precedent have not technically been satisfied.  This is ultimately immaterial however, as Plaintiffs' argument fails for other reasons.

While it is true that the Escrow Agreement also leaves open the possibility that the P&A Obligations would be completed by PEG's farmee, Apache was notably not PEG's farmee. To farm out means to "turn over something (such as an oil-and-gas lease) for performance by another." *Farm out*, Black's Law Dictionary (9th ed. 2009). Apache did not perform the P&A Obligations pursuant to a contractual relationship with PEG; rather, it did the work in its own self-interest to prevent additional liabilities from accruing. It would be inequitable to allow Plaintiffs' to recover the entire value of the contract based on a third party's performance of Plaintiffs' obligations. Greenwich's motion for summary judgment is granted to the extent it seeks to bar Plaintiffs' from recovering based on the entire value of the contract.

*The Court May Not Consider Evidence of the Parties' Past Dealings*

Plaintiffs argue further that the course of dealing between Plaintiffs and Greenwich during the Phase 1 decommissioning demonstrates that Plaintiffs are entitled to a distribution from the Phase 2 Escrow to pay the unpaid vendors. During the Phase 1 decommissioning, Plaintiffs assert that Greenwich made funds from the Phase 1 Escrow freely available to PEG to pay vendors and contractors as the work progressed. Plaintiffs interpret Greenwich's past conduct as establishing a "contractual right to funds as the work progressed" during Phase 2. (ECF. 198 at 14).

However, Greenwich is correct that evidence establishing a course of dealing or course of performance may not properly be considered when the underlying contract is unambiguous. This is true both under Texas and Louisiana law. *See James L. Gang & Assocs., Inc. v. Abbott Labs., Inc.*, 198 S.W.3d 434, 436 (Tex. App.—Dallas 2006, no pet.) ("When a contract is unambiguous, a court does not consider course of dealing"); La. Civ. Code art. 2046 ("When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may

be made in search of the parties' intent."). Plaintiffs did not have a *right* to receive payments as the work progressed, as they assert. Instead, the plain language of the contracts gave Plaintiffs the option to request prepayment, which Greenwich could not deny unreasonably. If Greenwich did in fact deny these requests unreasonably, then it may be liable for breach of contract. But it does not follow that because Greenwich accepted the requests in the past, it is automatically liable for rejecting a request at a later date.

*Plaintiff's Request for Injunctive Relief Is Denied*

Plaintiffs seek to enjoin Greenwich "from taking any steps to liquidate and/or transfer funds in the Phase 2 Escrow, until such time as this Court determines whether Greenwich . . . [is] liable to Tri-Union and/or PEG so that the segregated funds will be available for any judgment." (ECF No. 29 at 13). A plaintiff must establish four elements to secure a preliminary injunction:

> (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.

*Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011).

The request for an injunction must fail because Plaintiffs cannot show a threat of irreparable injury if the injunction is not issued. Plaintiffs have not explained how they would be irreparably injured if they obtained a money judgment without injunctive relief. "[T]he central inquiry in deciding whether there is a substantial threat of irreparable harm to the plaintiff is whether the plaintiff's injury could be decided by money damages." *Allied Marketing Grp., Inc. v. CDL Marketing, Inc.*, 878 F.2d 806, 810 n.1 (5th Cir. 1989). If Plaintiffs are successful on their breach of contract claim, they can receive money damage equal to the amount that should have been paid had Greenwich not unreasonably denied the payment requests. "In other words, . any harm that [Plaintiffs] might have suffered . . . could be adequately cured by money

damages." *Dresser-Rand Co. v. Virtual Automation, Inc.*, 361 F.3d 831, 848 (5th Cir. 2004).  An injunction preventing Greenwich from liquidating or transferring the funds in the Phase 2 Escrow is not necessary to protect Plaintiffs from irreparable harm.

Furthermore, there is no evidence that Greenwich, as escrow agent, has contemplated misappropriating the remaining funds in the Phase 2 Escrow.  Plaintiffs allege that Greenwich may "seek[] to sweep the Phase 2 Escrow funds as collateral for their bonds."  (ECF No. 198 at 20).  Greenwich possesses a first priority security interest in the Phase 2 Escrow as "continuing collateral security" for the "P&A Obligations with respect to the Operated Properties, and the obligations owed to and rights of [Greenwich] to secure payment of [Greenwich's] obligations arising under its Bonds. . . ."  (ECF. No. 198-4).  Although Greenwich has indicated it will not transfer funds out of the Phase 2 Escrow without court permission, it is unclear whether it is entitled to do so following the government's forfeiture of the surety bonds.  The parties are invited to file briefs regarding the proper disposition of the Phase 2 Escrow by October 20, 2015, at 5:00 p.m.

## Conclusion

The Court will issue an order consistent with this memorandum opinion.

SIGNED **September 28, 2015.**

Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE